UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| SeAH STEEL VINA CORPORATION, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>UNITED STATES, )<br><br>*Defendant,* )<br><br>*and* )<br><br>BULL MOOSE TUBE COMPANY; MARUICHI AMERICAN CORPORATION; WHEATLAND TUBE COMPANY; THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; NUCOR TUBULAR PRODUCTS INC., )<br><br>*Defendant-Intervenors.* ) | Court Nos. 23-256, 23-257 and 23-258 |

BRIEF OF PLAINTIFF SeAH STEEL VINA CORPORATION
IN SUPPORT OF ITS RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER REMOVED FROM PAGES 10 AND 38-40

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C.  20005
+1.202.774.5500

Attorneys for SeAH Steel VINA Corporation

June 17, 2024

Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2(C)(1) ................................................................... 2

   A.   Administrative Determination under Review ................................................ 2

   B.   Issues of Law and Summary of Reasons for
      Reversing Commerce's Determination ....................................................... 2

STATEMENT OF FACTS .................................................................................................. 6

STANDARD OF REVIEW ............................................................................................... 11

ARGUMENT ................................................................................................................... 11

   A.   In the Absence of New Evidence of Dumping, Subsidies,
      or Injury to the Competing U.S. Industry, Commerce Was
      Bound by Previous Findings that SSV's CWP Products
      Were Not Dumped or Subsidized, and Did Not Cause Injury .......................... 11

        1.   Under the Statute, Companies Whose Exports Have Been
            Found Not to Be Dumped or Subsidized, or Not to Cause
            Injury to the U.S. Industry, Cannot Be Subjected to the
            Burden of Antidumping or Countervailing Duty Orders .......................... 13

        2.   The Circumvention Provisions of the Statute
            Were Not Intended to Allow Antidumping or
            Countervailing Duty Remedies to Be Imposed on
            Exporters Whose Exports Have Explicitly
            Been Found Not to Be Dumped or Subsidized .......................................... 16

            a.   The Legislative History Indicates that the
                Circumvention Provisions Were Not Intended
                to Replace the Existing Statutory Scheme ............................................ 16

            b.   Statutory Silence Does Not
                Create Agency Authority ...................................................................... 19

            c.   The Anticircumvention Provisions are
                Limited by the Overall Statutory Scheme ............................................ 20

            d.   Commerce Is Not Permitted to Assign the Dumping
                Margins or Subsidy Rates for Other Companies to SSV .................. 22

   B.   The Production of Pipe from Hot-Rolled Coil Does Not
      Constitute a Process of "Completion" or "Assembly"
      Addressed by the Circumvention Provisions of the Statute ............................... 24

Page

    1.    Production of Pipe from Steel Coils
Does Not Constitute "Assembly" ................................................................. 25

    2.    Production of Pipe from Steel Coils Does Not
Constitute "Completion" of an Incomplete Item ........................................ 25

    3.    The Legislative History Confirms that Processing
Would Constitute Circumvention Only When It
Involved Nothing More than a "Slight Change"
in the "Method of Production or Shipment" ............................................... 30

    4.    The Legislative History Indicates that, for Pipe Products,
Congress Contemplated that Only Minor Finishing Operations
Would Fall Within the Ambit of the Circumvention Provisions ............... 31

C.    Production Operations by a Foreign Producer that Are
Essentially Identical to the Operations Performed by
the U.S. Producers Seeking the Circumvention Inquiry
Cannot Be Considered "Minor" or "Insignificant" ............................................. 33

D.    Commerce's Expansion of the Orders to Cover
SSV's Production Was Unlawful When None of the
Factors Commerce Is Required to Consider under
19 U.S.C. § 1677j(b)(3) Supported that Expansion ............................................. 35

    1.    Commerce May Only Expand the Coverage an Order
under the Circumvention Provisions If the Factors Set
Forth in 19 U.S.C. § 1677j(b)(3) Support Such Expansion ....................... 35

    2.    None of the Relevant Factors Supported
Expansion of the Orders to SSV's Products ............................................... 37

          a.    The "Pattern of Trade, Including Sourcing
Patterns," Did Not Support Commerce's
Expansion of the Orders to Cover SSV Products .............................. 37

          b.    There Is No Affiliation between SSV and Producers
of Hot-Rolled Steel Coils in Korea, China or India ......................... 39

          c.    Pattern of Imports into Vietnam of Materials
from the Countries Subject to the Orders .......................................... 39

    3.    Commerce Did Not Identify Any Other
Factors that Supported Expansion of the
Coverage of the Orders to SSV's Products ................................................ 40

Page

CONCLUSION .................................................................................................................... 42

Table of Authorities

Court Decisions

*Al Ghurair Iron & Steel LLC v. United States*,
    536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)................................................. 35

*Bell Supply Co., LLC v. United States*,
    83 F. Supp. 3d 1311 (Ct. Int'l Trade 2015)................................................. 35

*Daisy-Heddon v. United States,*
    600 F.2d 799 (C.C.P.A. 1979)................................................................ 29

*Diamond Sawblades Manufacturers' Coalition v. United States*,
    986 F. 3d 1351 (Fed. Cir. 2021)............................................................ 11

*FAG Italia S.p.A. v. United States*,
    291 F.3d 806 (Fed. Cir. 2002)........................................................ 19, 20

*Federal Trade Commission v. Ruberoid Co.*,
    343 U.S. 470 (1952)......................................................................... 21

*Forest Int'l Acquisition, Inc. v. United States*,
    497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021)....................................... 22, 23

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
    36 C.I.T. 1092 (2012)....................................................................... 24

*Hyundai Steel v. United States*,
    415 F. Supp. 3d 1293 (Ct. Int'l Trade 2019).......................................... 41

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)......................................................................... 19

*Louis Dreyfus Citrus, Inc. v. United States*,
    31 C.I.T. 964 (2007)......................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)........................................................................... 30

*NEXTEEL v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019).......................................... 41

*Peer Bearing Co.-Changshan v. United States,*
    986 F. Supp. 2d 1389 (Ct. Int'l Trade 2014).......................................... 35

*Sahaviriya Steel Indus. Pub. Co. v. United States*,
    34 C.I.T. 709 (2010)......................................................................... 17

Page

*Southern California Edison Co. v. Federal Energy Regulatory Commission*,
    195 F.3d 17 (D.C.Cir.1999) ................................................................... 19, 20

*Taniguchi v. Kan Pacific Saipan*,
    566 U.S. 560 (2012) .................................................................................. 26

*U.K. Carbon & Graphite Co. v. United States*,
    37 C.I.T. 1295 (2013) ............................................................................... 22

*Universal Camera Corp. v. N.L.R.B.*,
    340 U.S 474 (1951) .................................................................................. 11

STATUTES AND REGULATIONS

19 C.F.R. § 351.204 ....................................................................................... 14

19 C.F.R. § 351.226 ....................................................................................... 21

19 U.S.C. § 1516a .......................................................................................... 11

19 U.S.C. § 1671d ..................................................................................... 14, 15

19 U.S.C. § 1673d ..................................................................................... 14, 15

19 U.S.C. § 1675 ............................................................................................ 15

19 U.S.C. § 1677f-1 ....................................................................................... 14

19 U.S.C. § 1677j ..................................................................................... *passim*

1988 Omnibus Trade and Competitiveness Act,
    Pub. L. No. 100-418 (August 23, 1988) ...................................................... 28

ADMINISTRATIVE DECISIONS

*Certain Corrosion-Resistant Steel Products from the
    People's Republic of China:Affirmative Preliminary
    Determination of Circumvention Involving the United Arab Emirates*,
    85 Fed. Reg. 8841 (February 18, 2020) ...................................................... 37

*Final Affirmative Countervailing Duty Determination:
    Certain Steel Products from Austria*,
    58 Fed. Reg. 37217 (July 9, 1993) ............................................................ 23

*Certain Uncoated Paper from Brazil: Affirmative
    Preliminary Determination of Circumvention of the*

Page

*Antidumping Duty Order for Uncoated Paper Rolls*,
86 Fed. Reg. 7261 (January 27, 2021) .......................................................................... 37

*Certain Welded Carbon Steel Standard Pipes and
Tubes from India: Preliminary Negative Determinations
of Circumvention of the Antidumping Order*,
87 Fed. Reg. 52507 (August 26, 2022) ........................................................................ 37

*Circular Welded Carbon-Quality Steel Pipe from India,
Oman, the United Arab Emirates, and Vietnam*,
Investigation Nos. 701-TA-482-484 and 731-TA-1191-1194 (Final),
USITC Pub. 4362 (December 2012) ......................................................................... 7, 12

*Circular Welded Carbon-Quality Steel Pipe from Oman,
Pakistan, the United Arab Emirates, and Vietnam*,
Investigation Nos. 701-TA-549 and 731-TA-1299,
1300, 1302 and 1303 (Final),
USITC Pub. 4651 (December 2016) ..................................................................... 7, 8, 12

*Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic
of Vietnam: Final Determination of Sales at Less Than Fair Value*,
81 Fed. Reg. 75042 (Oct. 28, 2016) ............................................................................... 7

*Circular Welded Carbon-Quality Steel Pipe From the
Socialist Republic of Vietnam: Final Negative
Countervailing Duty Determination*,
77 Fed. Reg. 64471 (Oct. 22, 2012) .......................................................................... 7, 12

*Circular Welded Carbon-Quality Steel Pipe from
the Socialist Republic of Vietnam: Notice of Final
Determination of Sales at Less Than Fair Value*,
77 Fed. Reg. 64483 (Oct. 22, 2012) ............................................................................. 12

*Circular Welded Carbon-Quality Steel Pipe From the Socialist
Republic of Vietnam:Preliminary Affirmative Countervailing
Duty Determination and Alignment of Final Countervailing
Duty Determination With Final Antidumping DutyDetermination*,
77 Fed. Reg. 19211 (Mar. 30, 2012) ............................................................................ 12

*Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic
of Vietnam: Preliminary Determination of Sales at Less Than Fair
Value and Postponement of Final Determination*,
77 Fed. Reg. 32552 (June 1, 2012) .............................................................................. 12

Page

*Color Television Receivers from Korea: Final Results of*
*Changed Circumstances Review and Determination*
*Not to Revoke Antidumping Duty Order*,
52 Fed. Reg. 24500 (July 1, 1987) ........................................................................ 27

*Color Television Receivers from Korea: Intention to Review and Preliminary*
*Results of Changed Circumstances Administrative Review and*
*Tentative Determination To Revoke Antidumping Duty Order*,
52 Fed. Reg. 6840 (Mar. 5, 1987) ........................................................................ 27

*Color Television Receivers from Korea; Antidumping Duty Order*,
49 Fed. Reg. 18336 (Apr. 30, 1984) .................................................................... 27

*Crystalline Silicon Photovoltaic Cells and Modules from China*,
Inv. Nos. 701-TA-481 and 731-TA-1190 (Final),
USITC Pub. 4360 (Nov. 2012) .............................................................................. 34

*Final Determination of Sales at Less Than Fair Value; Tapered Roller*
*Bearings and Parts Thereof, Finished and Unfinished, from Japan*,
52 Fed. Reg. 30700 (Aug. 17, 1997) .................................................................... 16

*Heavy Walled Rectangular Welded Carbon Steel Pipes and*
*Tubes from the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review; 2020–2021*,
88 Fed. Reg. 13088 (Mar. 2, 2023) ...................................................................... 24

*Nylon Impression Fabric From Japan: Initiation*
*of Antidumping Duty Investigation*,
50 Fed. Reg. 28111 (July 10, 1985) .................................................................... 16

*Oil Country Tubular Goods from the People's Republic of China:*
*Preliminary Affirmative Determinations of Circumvention*,
86 Fed. Reg. 43627 (August 10, 2021) ................................................................ 37

C̲O̲N̲G̲R̲E̲S̲S̲I̲O̲N̲A̲L̲ M̲A̲T̲E̲R̲I̲A̲L̲S̲

America COMPETES Act of 2022,
H.R. 4521, 117th Cong. (2022) ............................................................................ 21

Congressional Record-Senate,
June 25, 1987, Vol. 133, Part 13 ........................................................................ 18

H. Rept. No. 100-40, Part 1 (1987) .......................................................... *passim*

Leveling the Playing Field 2.0 Act,
H.R. 3882, 118th Cong. (2023) ............................................................................ 21

Page

Leveling the Playing Field 2.0 Act,
S. 1856, 118th Cong. (2023) ......................................................................... 21

S. Rept. No. 100-71 (1987) ................................................................................ 17

Uruguay Round Agreements Act, SAA,
H.R. Doc. No. 103-316 (1994)...................................................................... 14

OTHER AUTHORITIES

Harmonized Tariff Schedule, General Rules of Interpretation 2(a)................................... 29

Panel Report, *Ukraine – Anti-Dumping Measures on Ammonium Nitrate*,
WTO Doc. WT/DS493/R .............................................................................. 24

Tariff Schedule of the United States, General Headnotes and
Rules of Interpretation, Headnote 10(h)........................................................ 29

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| SEAH STEEL VINA CORPORATION, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> *and* <br><br> BULL MOOSE TUBE COMPANY; MARUICHI AMERICAN CORPORATION; WHEATLAND TUBE COMPANY; THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; NUCOR TUBULAR PRODUCTS INC., <br><br> *Defendant-Intervenors.* | Court Nos. 23-256, 23-257 and 23-258 |

BRIEF OF PLAINTIFF SEAH STEEL VINA CORPORATION
IN SUPPORT OF ITS RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD

This brief is submitted on behalf of SeAH Steel VINA Corporation ("SSV") to contest the final determination by the U.S. Department of Commerce ("Commerce") in its circumvention inquiries concerning Circular Welded Non-Alloy Steel Pipe ("CWP") produced in Vietnam using hot-rolled steel coils purchased from suppliers in Korea, India, or the People's Republic of China.

STATEMENT PURSUANT TO RULE 56.2(C)(1)

A.    *Administrative Determination under Review*

Commerce published notice of its final determinations in the circumvention inquiries

in the *Federal Register* on November 9, 2023.[1]  Commerce's discussion of the issues

raised in each of the inquiries was set forth in separate memoranda dated November 2,

2023.[2]

B.    *Issues of Law and Summary of Reasons for*
     *Reversing Commerce's Determination*

1.    *Whether Commerce may properly treat merchandise produced by SSV as*
      *dumped and subsidized through a circumvention inquiry when it has*
      *previously investigated the same merchandise and concluded that SSV was*
      *not dumping and did not receive subsidies, and when no information has*
      *been adduced to contradict Commerce's previous findings?*

The fundamental rule under the statute is that antidumping and countervailing duty

measures can only be imposed on companies whose exports were dumped or subsidized

and have caused injury to the competing U.S. industry.  Companies that are investigated

---

[1] *See Certain Circular Welded Non-Alloy Steel Pipe from Korea: Final Affirmative Determination of Circumvention of the Antidumping Order*, 88 Fed. Reg. 77270 (Nov. 9, 2023); *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 Fed. Reg. 77279 (Nov. 9, 2023); *Circular Welded Carbon Quality Steel Pipe from China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 Fed. Reg. 77287 (Nov. 9, 2023).

[2] *See* Joint Appendix for Court No. 23-256 (referred to in this brief as "256-APPX") at 256-APPX007525-APPX007573 (Korea); Joint Appendix for Court No. 23-257 (referred in this brief as "257-APPX") at 257-APPX007521-APPX007569 (India); and Joint Appendix for Court No. 23-258 (referred in this brief as "258-APPX") at 258-APPX007516-APPX007563 (China).

In accordance with the Court's Scheduling Order dated April 9, 2024, SSV is filing a single brief under Court No. 23-256, but will file separate administrative records on the docket of each individual case.  Citations in this brief will be made only to the administrative record in Court No. 23-256, except where the information referenced is not found on the record of that case, but only on the record of one of the other cases.

and whose sales are found not to have dumped and who have been found not to have received subsidies are automatically excluded from any antidumping or countervailing duty order and the burdens imposed by such orders. Commerce may have the authority to include companies that were not individually examined within the scope of its orders when the evidence shows that the companies that were examined had dumped or subsidized sales. But Commerce cannot include within the scope of its orders a company that was examined and exonerated of the charges of dumping and subsidies, unless it initiates a new investigation based on new evidence, and makes an affirmative determination of dumping or subsidies for that company.

In this case, SSV was specifically examined by Commerce in previous investigations and was found to have *de minimis* dumping and subsidies. Nevertheless, in its Final Determinations in the circumvention inquiries that are the subject of this appeal, Commerce has asserted that, because the anticircumvention provisions of the statute do not explicitly forbid the expansion of an order to cover companies like SSV that were investigated and exonerated of the charges of dumping and subsidies, it has the authority to expand the scope of existing orders on CWP from other countries to cover SSV.

It is well-settled, however, that statutory silence does not convey authority on an agency to take action otherwise forbidden by statute. As the Courts have recognized, Congress cannot be expected to explicitly deny in advance every possible assertion of authority by an agency. In this case, there is no indication in the statute or legislative history that Congress intended to depart from the fundamental principle that antidumping and countervailing duty measures cannot apply to companies that have been shown not to be dumping or to have received subsidies. Commerce's expansion of the scope of the

orders on CWP from Korea, China and India to cover SSV's exports was, therefore, *ultra vires* and improper.

> 2. *Whether the production of pipe from hot-rolled steel coils constitutes a process of "completion" or "assembly" under the statute?*

The circumvention provisions of the statute apply only when merchandise from a country covered by an order is subject to a process of "assembly or completion" in the United States or a third country. The term "assembly" refers to the process in which parts are "fit together." That term is, therefore, inapplicable to SSV's production of CWP, which involves the slitting, forming, and welding of steel coils into a tubular shape, and not an assembly of parts.

The legislative history confirms that the term "completion" was adopted to address specific instances in which "incomplete" merchandise from the subject country was "completed" in another country. Other provisions of the same statute define the term "incomplete" to mean an item containing the "essential character" of the finished product. Consequently, in order to conclude that SSV's production of pipe from hot-rolled steel coils constituted a process of "completion," Commerce had to find that the steel coils imported by SSV from Korea, China, and India had the "essential character" of the finished CWP. Commerce did not make such a finding, and failed to address SSV's argument concerning the statutory definition of "complete" and "incomplete" merchandise. Accordingly, Commerce's determination cannot be upheld.

> 3. *Whether the process of producing pipe from hot-rolled steel coils may be considered "minor or insignificant" under the statute when the record evidence demonstrates that the U.S. producers that requested the circumvention inquiries only performed similar processes in their production?*

The statute permits Commerce to expand the scope of an order to cover third-country production only when it finds that the processing operations performed in the third-country

are "minor" or "insignificant." The statute does not explicitly define the terms "minor" and "insignificant," but does identify certain factors that Commerce must consider when assessing whether the third-country production falls within those terms. At the same time, nothing in the statute indicates that the identified factors are the only items that Commerce may consider in making its determination.

The evidence in this case demonstrates that the domestic producers who requested the circumvention inquiry produced CWP using precisely the same processes as SSV. None of the U.S. producers manufactured their own steel coils. Instead, they purchased the coils they used from outside suppliers. The owner of two of those companies revealed that a substantial volume of the coils they used were imported from "foreign supply sources."

It is well-settled that U.S. producers with "production-related activity at minimum levels" are not properly considered part of the U.S. industry. Consequently, a finding that the operations performed by SSV were "minor" or "insignificant" would raise serious questions about the standing of the U.S. producers, whose operations are equally insignificant, to request antidumping or countervailing duty orders. In these circumstances, Commerce's determination that SSV's production operations were "minor" or "insignificant" was fundamentally inconsistent with its decision to allow U.S. producers whose operations were identical to commence the inquiries that are the subject of this appeal.

    4.   *Whether Commerce could properly make an affirmative determination to subject SSV's CWP products to the existing orders when none of the factors that Commerce is required to consider under 19 U.S.C. § 1677j(b)(3) supported that conclusion?*

The statute sets out several prerequisites that must be satisfied before Commerce may take anticircumvention action against third-country production. However, the statute makes clear that action should not be automatic even when those requirements are

satisfied.  Instead, the statute provides that Commerce must make a further finding that

action is appropriate after considering such factors as:  (1) the pattern of trade, including

sourcing patterns; (2) whether the third-country producer is affiliated with the supplier of

the inputs from the country subject to the existing order; and (3) whether imports of the

input into the country subject to the order have increased since initiation of the

investigation against the country subject to the order.

In its Final Determination, Commerce asserted that analysis of the three required

factors was "mixed and inconclusive."  That description is not accurate.  In reality, all three

of the statutory factors pointed against taking anticircumvention actions, since SSV's

exports of CWP to the United States had fallen sharply over the period for which

Commerce requested information, SSV was not affiliated with any of the Korean, Chinese,

or Indian companies that produced the hot-rolled coils used in SSV's production, and the

volume of SSV's imports had fallen.

In spite of this evidence, Commerce asserted that "other factors" supported its

decision to take anticircumvention action.  But it never identified what those factors might

be, or how evidence concerning those factors supported Commerce's decision to take

action.  In the absence of such explanation, Commerce's determination cannot be

sustained.

STATEMENT OF FACTS

There is no question that "circumvention" has occurred in this case.  But it was not

circumvention by SSV of existing antidumping or countervailing duty orders on CWP

from China, India, and Korea.  Instead, it was a gross circumvention by Commerce of the

fundamental requirement that a company that has been expressly investigated and found

not to be dumping or subsidized, and whose exports have been found not to have caused

injury to the competing U.S. industry, cannot be subject to the burden of antidumping and countervailing duty orders.

SSV was established in 1995, and has been producing CWP using purchased hot-rolled steel coils ("HRC") since 1998.[3]  Its exports of CWP from Vietnam to the United States have long been a source of trade disputes.  U.S. producers of CWP tried on two separate occasions to subject SSV's exports of CWP to antidumping or countervailing duties, filing petitions against Vietnam and multiple other countries in 2011 and 2015. Both of those efforts failed:  The 2011 petition resulted in a negative determination of subsidies for SSV by Commerce, and a negative injury determination by the International Trade Commission ("ITC").[4]  The 2015 petition (which did not include countervailing duty claims against Vietnam) resulted in a negative determination of dumping for SSV by Commerce, and a negative injury determination for the remaining Vietnamese exporters by the ITC.[5]

Having twice failed to establish a basis for the imposition of duties on SSV's exports through the normal statutory procedures, the U.S. producers in May 2022 asked Commerce

---

[3] *See* SSV's October 7, 2022, Initial Questionnaire Response ("Initial Response") at 2-3 (256-APPX001894-001895, 256-APPX080317-080318).

[4] *See Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam: Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64471 (Oct. 22, 2012); *Circular Welded Carbon-Quality Steel Pipe from India, Oman, the United Arab Emirates, and Vietnam*, Investigation Nos. 701-TA-482-484 and 731-TA-1191-1194 (Final), USITC Pub. 4362 (December 2012) ("ITC 2012 CWP Final Determination").

[5] *See Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75042 (Oct. 28, 2016); *Circular Welded Carbon-Quality Steel Pipe from Oman, Pakistan, the United Arab Emirates, and Vietnam*, Investigation Nos. 701-TA-549 and 731-TA-1299, 1300, 1302 and 1303 (Final), USITC Pub. 4651, at 13-14 (December 2016) ("ITC 2016 CWP Final Determination").

to apply duties anyway, based on the claim that the exports by SSV that Commerce had already investigated twice before were somehow "circumventing" antidumping and countervailing duties on *other* countries.  But the claim of circumvention in this case is farcical.  The statute simply does not contemplate that the circumvention provisions might be used to effectively overturn explicit findings that a company's exports were not dumped or subsidized.

Furthermore, even if SSV's exports had not previously been investigated and exonerated, anticircumvention action here was clearly contrary to the Congressional intent.  The legislative history of the circumvention provisions indicates that Congress intended to address situations where a company subject to an antidumping or countervailing duty order made "slight changes" to its method of production to evade the burden of the order.  But SSV's production in Vietnam did not represent a "slight change" in the production processes of its Korean affiliate that produces CWP.

The CWP at issue in this appeal is produced by slitting hot-rolled steel coils ("HRC") to a desired width (equal to $\pi$ multiplied by the desired diameter of the pipe), forming the strips of slit steel into a tubular shape, welding the edges of the strips together, cutting the resulting pipe to the desired length, and then finishing the pipe with operations like threading.[6]  This production process is completely independent of the production of the hot-rolled steel coils used as raw materials.  Indeed, the record evidence demonstrates that neither SSV, nor its Korean affiliate SeAH Steel Corporation, nor the U.S. producers who requested the circumvention inquiries themselves produce steel coils.  Instead, all

---

[6] *See e.g.*, ITC 2016 CWP Final Determination, at I-15 and I-16 (emphasis added).  An excerpt from the ITC's report was submitted as Exhibit 2 of the Domestic Interested Parties' May 17 Requests for Inquiry (256-APPX001049-001062).

purchased the coils they used from other suppliers.[7]   In fact, the holding company that owns the U.S. producers Wheatland Tube Company and Atlas Tube, Inc. told the Securities and Exchange Commission that it was "the largest consumer of HRC by volume in the United States" and that a significant volume of its purchased hot-rolled coils came from "foreign supply sources."[8]

Significantly, none of the coils used by SSV were produced by affiliated suppliers. None of the production processes for its CWP were performed by affiliates in other countries.  Instead, the production operations performed by SSV in Vietnam were essentially identical to those performed by its Korean affiliate *and* to those performed by its U.S. competitors.  Conducting the entire pipe production process in Vietnam simply does not constitute the "slight change" in production processes the circumvention provisions were intended to address.

The statute requires Commerce, when determining whether the scope of an order should be expanded under the circumvention provision to cover third-country production, to consider such factors as:  (1) the pattern of trade, including sourcing patterns; (2) whether the third-country producer is affiliated with the supplier of the inputs from the country subject to the existing order; and (3) whether imports of the input into the country subject to the order have increased since initiation of the investigation against the country subject to the order.  Commerce asserted that analysis of those factors was "mixed and

---

[7] *See* SSV's March 10, 2023, Resubmission of Factual Information (256-APPX006634-006936).

[8] *See id.*, at Attachment 1-D (256-APPX006662).

inconclusive."[9]  But that description is not consistent with the evidence.  In fact, none of

the statutory factors supported anticircumvention action in this case.  SSV is not affiliated

with any of the hot-rolled coil producers in China, India or Korea.  SSV's total exports of

CWP to the U.S. fell [    ] percent over the five-year period considered by Commerce (from

[            ] metric tons in 2017 to [            ] metric tons in 2021).[10]  Not surprisingly,

SSV's total import purchases of hot-rolled coils from the relevant countries also fell by

more than [    ] percent over that period (from [            ] metric tons in 2017 to [        ]

metric tons in 2021).[11]  Such patterns of trade cannot support a finding that CWP from

Vietnam were circumventing existing orders on CWP.

Despite this evidence, Commerce asserted that action to prevent circumvention was

required by "other factors."[12]  But it never explained what those "other factors" were, or

how they might support anticircumvention action when the factors identified in the statute

did not.  Such behavior does not reflect a reasoned conclusion in accordance with law.  The

Court should intervene to prevent this irrational and unlawful result.

---

[9] *See e.g.*, Certain Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Preliminary Decision Memorandum for the Circumvention Inquiry on the Antidumping Duty Order ("Korea Prelim"), April 6, 2023, at 20 (emphasis added) (256-APPX007021).

[10] *See* SSV's Initial Response at Appendix 33 (256-APPX002516-002519, 256-APPX081291-081293).

[11] SSV's imports of HRC from China fell from [        ] metric tons in 2017 to [        ] tons in 2021, and SSV's imports of HRC from Korea fell from [        ] metric tons to [        ] metric tons over the same period.  *See* Korea Preliminary Analysis Memorandum at 6 (256-APPX007037, 256-APPX086241); China Preliminary Analysis Memorandum at 7 (258-APPX007075, 258-APPX087958).  SSV's imports of HRC from India increased slightly from [        ] metric tons in 2017 to [        ] metric tons in 2021.  *See* India Preliminary Analysis Memorandum at 6 (257-APPX007049, 257-APPX086134).

[12] *See e.g.*, Korea Prelim at 20 (emphasis added) (256-APPX007021).

<u>STANDARD OF REVIEW</u>

The court "shall hold unlawful any determination, finding, or conclusion found... to be unsupported by substantial evidence, or otherwise not in accordance with law."[13]  A determination is supported by substantial evidence if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[14]  Significantly, that determination must have considered "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"[15]  Under that standard, the Court must examine the record as a whole and determine whether a "reasonable mind" would consider the evidence "adequate," after considering both the evidence supporting and detracting from the agency determination.

<u>ARGUMENT</u>

A.   *In the Absence of New Evidence of Dumping, Subsidies,*
     *or Injury to the Competing U.S. Industry, Commerce Was*
     *Bound by Previous Findings that SSV's CWP Products*
     *Were Not Dumped or Subsidized, and Did Not Cause Injury*

As discussed above, SSV's exports of CWP to the United States were the subject of two previous investigations by Commerce.  In 2011, the U.S. producers of CWP filed antidumping and countervailing duty petitions against imports of CWP from Vietnam.  SSV was selected as a mandatory respondent and individually examined by Commerce in the ensuing investigations.  The preliminary determinations in the 2011 antidumping and

---

[13] 19 U.S.C. § 1516a(b)(1)(B)(i).

[14] *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F. 3d 1351, 1362 (Fed. Cir. 2021).

[15] *Id.  See also Universal Camera Corp. v. N.L.R.B.*, 340 U.S 474, 488 (1951).

countervailing duty investigations were negative.[16]  In the final determinations, Commerce

increased SSV's dumping margin to 3.96 percent, but again found only *de minimis*

subsidies.[17]  Before SSV could appeal the dumping determination, the ITC made a

negative injury determination, terminating the investigations.[18]

In 2015, the U.S. producers of CWP again filed an antidumping petition (but not a

countervailing duty petition) against imports of CWP from Vietnam.  SSV was again

selected as a mandatory respondent and individually examined by Commerce in the

ensuing investigation.  In the 2015 investigation, Commerce made a negative

determination for SSV, finding a final dumping margin of *zero*.[19]  And, once more, the ITC

made a negative injury determination for Vietnam.[20]

---

[16] *See Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 77 Fed. Reg. 32552 (June 1, 2012); *Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination*, 77 Fed. Reg. 19211 (Mar. 30, 2012).

[17] *See Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam: Notice of Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 64483 (Oct. 22, 2012); *Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam: Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64471 (Oct. 22, 2012).

[18] *See Circular Welded Carbon-Quality Steel Pipe from India, Oman, the United Arab Emirates, and Vietnam*, Investigation Nos. 701-TA-482-484 and 731-TA-1191-1194 (Final), USITC Pub. 4362 (December 2012).

[19] *See id.*

[20] *See Circular Welded Carbon-Quality Steel Pipe from Oman, Pakistan, the United Arab Emirates, and Vietnam*, Investigation Nos. 701-TA-549 and 731-TA-1299, 1300, 1302 and 1303 (Final), USITC Pub. 4651, at 13-14 (December 2016).

In both the 2011 and 2015 investigations, Commerce's determinations explicitly addressed SSV's use of imported steel coils in its production.[21]  The negative determination of dumping and injury in the 2015 investigation was based on a record that explicitly demonstrated, *inter alia,* that SSV had used steel coils purchased from Chinese and Korean producers in its CWP production.[22]

Commerce's determination in the circumvention inquiries asserted that these past negative determinations did not preclude a finding that SSV's products were circumventing antidumping and countervailing duty orders on other countries.[23]  That assertion is, however, contrary to the statutory scheme.

     1.   *Under the Statute, Companies Whose Exports Have Been Found Not to Be Dumped or Subsidized, or Not to Cause Injury to the U.S. Industry, Cannot Be Subjected to the Burden of Antidumping or Countervailing Duty Orders*

Under the statute, a foreign exporter may be subjected to an antidumping or countervailing duty order only if Commerce makes an affirmative determination of dumping or subsidies with respect to that exporter and if the ITC makes an affirmative

---

[21] *See* Memorandum to The File, "Analysis for the Preliminary Determination of the Antidumping Duty Investigation of Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam (Vietnam): SeAH Steel VINA Corporation (SeAH VINA)," dated May 23, 2012; *see also* SeAH VINA's Letter, ''Certain Circular Welded Carbon Quality Steel Pipe and Certain Circular Welded Non Alloy Steel Pipe from China, Korea, Taiwan, and India—Comments in Opposition to Initiation of Anticircumvention Inquiries,'' dated June 2, 2022 ("SSV's Opposition Comments") (256-APPX001444-001446, 256-APPX080198-080200).

[22] *See* SSV's Opposition Comments, at Attachment 2 (providing Appendix D-7-A of SSV's February 18, 2016, Submission in Case No. A-552-820) (256-APPX001468-001476, 256-APPX080222-080230).

[23] *See e.g.*, Issues and Decision Memorandum for the Final Affirmative Determination of Circumvention of the Antidumping Duty Order on Certain Circular Welded Non-Alloy Steel Pipe from the Republic of Korea ("Korea I&D Memo"), Nov. 2, 2023, at 15-16 (256-APPX007539-007540).

determination of injury with respect to the exporting country.[24]  On the other hand, any exporter that is found not to be dumping or not to have received subsidies must be excluded from any order that is issued.[25]  And, if the ITC makes a negative injury determination, no order may be issued at all.[26]

The statute contemplates that, as a general rule, Commerce will examine each known exporter from the country under examination.[27]  However, when the number of exporters is too large to permit individual examination, Commerce is permitted to limit its examination to a subset of exporters and apply the average results of its examination of those exporters to "all other" exporters from the country.[28]  Significantly, the statutory authority to apply the average results for examined exporters to others is limited to circumstances in which the others cannot be individually investigated.[29]  By contrast, when a company is individually examined in an investigation (as SSV has been), that company may only be subject to an antidumping or countervailing duty order if its own exports have been found to have been above *de minimis* dumping or subsidies.[30]

---

[24] *See* 19 U.S.C. § 1673d(c)(2).

[25] 19 U.S.C. § 1673d(a)(4); 19 C.F.R. § 351.204(e)(1); and Uruguay Round Agreements Act, SAA, H.R. Doc. No. 103-316 at 844 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("*De minimis* margins are regarded as zero margins. Exporters or producers with *de minimis* margins will be excluded from any affirmative determination.").

[26] *See* 19 U.S.C. § 1673d(c)(2).

[27] *See* 19 U.S.C. § 1677f-1(c)(1) and (e)(1).

[28] *See* 19 U.S.C. § 1677f-1(c)(2) and (e)(1).

[29] *See* 19 U.S.C. § 1671d(c)(5) and § 1673d(c)(5).

[30] *See* above at note 25.

A finding that a company is subject to an antidumping or countervailing duty order has a number of consequences.  As an initial matter, it means that anyone who imports from the company must pay cash deposits of estimated antidumping or countervailing duties on the imports.[31]  Furthermore, liquidation of those imports is automatically suspended.[32]  And, the exporting company may be subjected to annual administrative reviews, at its own request or at the request of the competing U.S. producers, until the order is finally revoked.[33]  Importantly, those consequences apply only to companies whose exports were found in the original investigation to be dumped or subsidized (either through individual examination of the exporter or through application of the "all others" rate).  Exporters whose exports were investigated and found not to be dumped or subsidized are not subject to cash deposit requirements, suspension of liquidation, or potential annual reviews.

As described above, CWP from Vietnam has been investigated twice for dumping and once for subsidies.  In both investigations, the ITC found no injury.  Furthermore, Commerce found *de minimis* subsidies for SSV and, in the most recent investigation, no dumping by SSV.  Under the statutory scheme, therefore, SSV cannot be subject to the legal consequences of an antidumping or countervailing duty order unless and until there is a new investigation of CWP from Vietnam that results in affirmative findings of injurious dumping and injurious subsidies with respect to SSV.  This principle has long been recognized by Commerce — which has, on several occasions, initiated new investigations

---

[31] *See* 19 U.S.C. § 1671d(c)(1)(B)(ii) and § 1673d(c)(1)(B)(ii).

[32] *See* 19 U.S.C. § 1671d(c)(1)(C) and § 1673d(c)(1)(C).

[33] *See* 19 U.S.C. § 1675(a) and (d)(1).

of companies that were excluded from previous orders based on negative determinations of dumping and subsidies, and has included those companies under new orders only after it made affirmative determinations in the new investigations.[34]

> 2. *The Circumvention Provisions of the Statute Were Not Intended to Allow Antidumping or Countervailing Duty Remedies to Be Imposed on Exporters Whose Exports Have Explicitly Been Found Not to Be Dumped or Subsidized*

> a. *The Legislative History Indicates that the Circumvention Provisions Were Not Intended to Replace the Existing Statutory Scheme*

Congress added the anticircumvention provisions to the statute through the 1988 Omnibus Trade and Competitiveness Act ("Omnibus Act"), and later amended those provisions in the 1994 Uruguay Round Agreements Act ("URAA"). These provisions permit Commerce to include additional products within the scope of an existing order when foreign exporters attempt to evade the reach of an existing order (1) by making minor changes in their products, (2) by shifting the final minor stages of their production processes to another country, or (3) by developing a new product after an investigation that is essentially the same as merchandise within the scope of the order that was considered

---

[34] *See e.g.*, *Nylon Impression Fabric From Japan: Initiation of Antidumping Duty Investigation*, 50 Fed. Reg. 28111 (July 10, 1985) (petition was limited to the two companies that received *de minimis margins* in the original investigation and were thereby excluded from the order); *Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan*, 52 Fed. Reg. 30700 (Aug. 17, 1997) (a portion of the scope identified the subject merchandise on a company-specific so long as the company remained revoked from a pre-existing order). *See also*, *Louis Dreyfus Citrus, Inc. v. United States*, 31 C.I.T. 964, 968 (2007) (upholding the scope of the new investigation on Orange Juice from Brazil to cover all producers of orange juice not-from-concentrate and the specific producers of frozen concentrated orange juice that were excluded or revoked from an earlier order on Frozen Concentrated Orange Juice from Brazil).

during the investigation.[35]  Nothing in the language of the statute suggests that the anticircumvention provisions were meant to include products in the scope of an existing order that had been separately investigated and found to not cause injury, not be dumped, and not be subsidized.

The legislative history provides additional clarity on the intended purpose of the anticircumvention provisions.[36]  For example, the report of the House Ways and Means Committee on the 1988 Omnibus Act that added the anticircumvention provisions to the statute explained the reasons for that change as follows:

> The Committee is concerned about the increasing instances in numerous product sectors, of circumvention and evasion of antidumping ... and countervailing duty orders.  Under present law, parties subject to these orders have often been able *to circumvent or evade the order by making slight changes in their method of production or shipment* of the merchandise destined for consumption in the United States.  As a result, the existence of these "loopholes" has seriously undermined the effectiveness of the remedies provided by the antidumping and countervailing duty proceedings and frustrated the purpose for which these laws were enacted.[37]

The Ways and Means Committee Report also provided the following specific examples of the types of circumvention or evasion that the new provisions were intended to address:

- ▪ "the importation of parts or components to be assembled into the class or kind of merchandise covered by the order, such as when picture tubes and printed circuit

---

[35] S. Rept. No. 100-71, at 101 (1987).

[36] *See Sahaviriya Steel Indus. Pub. Co. v. United States*, 34 C.I.T. 709, 721 (2010), aff'd, 649 F.3d 1371 (Fed. Cir. 2011) ("If, however, the statute's text does not explicitly address the question at issue, the Court must seek to determine whether Congress had an intent on the matter.").

[37] H. Rept. No. 100-40, Part 1, at 135 (1987) (emphasis added).

boards are shipped by the manufacturer to a related subsidiary to be assembled and then sold as a television receiver;"

▪ "the importation of an incomplete or unfinished article to be completed in the United States, by means other than assembly, into the class or kind of merchandise covered by the order, such as when steel pipe is imported by a related party that threads it and sells it as threaded pipe.;"

▪ "when ethanol is shipped to a third country for dehydration or for blending with a small amount of additive;" or

▪ "when steel sheet is cut to length in a third country prior to importation into the United States."[38]

In all of these cases, the concern expressed by Congress was that products subject to an *existing* antidumping order might be shipped in incomplete form and completed elsewhere. Nothing in the legislative history indicates that Congress intended the circumvention provisions to allow Commerce to impose antidumping remedies on products that had been specifically investigated and found not to be dumped.  As Senator Danforth of the Finance Committee explained, the circumvention provisions were thought to be needed because "foreign exporters have developed several methods *for evading existing provisions*, and efforts to combat such practices as circumvention and hit-and-run dumping…" were necessary.[39]  This history confirms that the circumvention provisions had a limited purpose of combating actions taken by foreign exporters to evade the reach of an existing order,

---

[38] *Id.,* at 134.

[39] Congressional Record-Senate, June 25, 1987, Vol. 133, Part 13, at 17463 (Bound Edition), available at https://www.congress.gov/bound-congressional-record/1987/06/25/senate-section.

and not to permit duties to be imposed on products after investigations by the relevant agencies explicitly found that the injurious dumping and subsidies that are the statutory prerequisites for the imposition of duties were not satisfied.

           *b.   Statutory Silence Does Not*
                *Create Agency Authority*

In its Final Determination, Commerce claimed that it was permitted to treat SSV's production of CWP as circumvention because the statute does not explicitly prohibit circumvention inquiries on products that have been investigated and found not to be dumped or subsidized.[40]  However, the Federal Circuit has explained that "statutory silence as to Commerce's power… does not give Commerce authority to conduct {all} inquiries." Instead, "{t}he fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances."[41]  The Court went on to explain that it would not find that Commerce's action was permitted under the statute when Congress did not explicitly authorize such action and when there was no legislative history suggesting that Congress had contemplated the action taken by Commerce.[42]  Furthermore, in reaching that holding, the Court relied on the DC Circuit decision in *Southern California Edison*.[43]  In that case, the DC Circuit rejected the

---

[40] *See e.g.*, Korea I&D Memo at 15-16 (256-APPX007539-007540).

[41] *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 817 (Fed. Cir. 2002).

[42] *See id.  See also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("…an agency literally has no power to act ... unless and until Congress confers power upon it.").

[43] *See FAG Italia S.p.A.*, 291 F.3d at 816.

agency's interpretation of the statute because it "would have the effect of requiring Congress to state expressly any denial of authority to the agency."[44]

As detailed above, the legislative history on the anticircumvention provisions indicates that Congress contemplated that the provisions would apply to new products that had not been investigated, not to merchandise that had been investigated and subject to a negative determination. As a result, Commerce's interpretation of the anticircumvention provision does not comport with the legislative history. Furthermore, Commerce's interpretation would have the same impermissible effect identified in *Southern California Edison*. In these circumstances, the statute's silence does not confer authority on Commerce to conduct a circumvention inquiry on Vietnamese CWP that had been previously investigated and found to not result in injurious dumping or subsidies.

c. *The Anticircumvention Provisions are Limited by the Overall Statutory Scheme*

In its Final Determination, Commerce also argued that it properly initiated the circumvention inquiries on CWP from Vietnam because the inquiry requests "met all the requirements for initiating an inquiry under section 781(b) of the Act."[45] However, the statute does not set forth criteria to for when a circumvention inquiry must be initiated. The language of the statute is limited to the criteria Commerce must consider to find circumvention after an inquiry is initiated.

---

[44] *Id*. (quoting *Southern California Edison Co. v. Federal Energy Regulatory Commission*, 195 F.3d 17, 24 (D.C.Cir.1999) (internal quotations omitted)).

[45] *See e.g.*, Korea I&D Memo at 16 (256-APPX007540).

Instead, it is Commerce's regulations that identify the requirements for initiating a circumvention inquiry.[46]  Notably, attempts have been made to enact legislation requiring Commerce to initiate circumvention inquiries whenever allegations that the statutory requirements have been satisfied (even if an inquiry was not warranted for some other reason).  For example, such a bill was introduced in the House of Representatives in 2021. The bill passed the House, but the relevant provisions were removed by the Senate and were ultimately not included in the version of the bill that approved by the Senate.[47] Additional bills attempting to impose such a requirement have subsequently been introduced but all have been unsuccessful.[48]  Congress, therefore, has *not* required Commerce to conduct circumvention inquiries in all instances in which a request alleges the criteria set forth in the circumvention statute.

As the Supreme Court has explained, when attempts to amend the statute to grant authority to an agency have failed, it will not permit the agency to "achieve the same result by reinterpretation in the face of Congress' failure to pass the bills thus brought before it."[49]  As detailed above, the established statutory scheme requires a new investigation for products that have been previously investigated and subject to a negative determination.  In addition, the text and legislative history of the anticircumvention statute does not authorize Commerce to use the circumvention inquiry process for previously investigated products

---

[46] 19 C.F.R. § 351.226(d)(1)(iii) and (c)(1).

[47] *Compare See* America COMPETES Act of 2022, H.R. 4521, 117th Cong. § 102201 (as passed by House, Feb. 4, 2022)  *with See* America COMPETES Act of 2022, H.R. 4521, 117th Cong. § 102201 (as passed by Senate, March 28, 2022) .

[48] *See e.g.*, Leveling the Playing Field 2.0 Act, H.R. 3882, 118th Cong. § 301 (2023)  and Leveling the Playing Field 2.0 Act, S. 1856, 118th Cong. § 301 (2023) .

[49] *Federal Trade Commission v. Ruberoid Co.*, 343 U.S. 470, 478-79 (1952).

subject to a negative determination.  In these circumstances, Commerce's regulations are insufficient to support its decision to conduct circumvention inquiries on CWP from Vietnam.

> d.  *Commerce Is Not Permitted to Assign the Dumping Margins or Subsidy Rates for Other Companies to SSV*

After reaching affirmative circumvention determinations, Commerce assigned the country-wide or all-others rate from the investigations of CWP from Korea, India, and China as the cash deposit rate for CWP produced by SSV with HRC from the respective country.[50]  However, Commerce has justified using the country-wide or all-others rate from the investigation of the underlying order for third-country companies subject to the circumvention inquiry, on the basis that Commerce had not made a final determination of dumping or subsidies for the third-country producers at the time of the circumvention determination to assign a company-specific rate.[51]

In addition, this Court has rejected Commerce's use of the country-wide or all-others rate from the investigation of the underlying order as the cash deposit rate for third-country companies subject to an affirmative circumvention determination, when Commerce did not consider evidence whether that rate was appropriate for the third-country companies.[52]  As this Court explained, Commerce's automatic use of the country-wide or all-others rate from the investigation of the underlying order to such third-country companies "appears to

---

[50] *See e.g.*, *Certain Circular Welded Non-Alloy Steel Pipe From the Republic of Korea: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 Fed. Reg. 77270, 77271 (Nov. 9, 2023) (256-APPX007575).

[51] *See e.g.*, *U.K. Carbon & Graphite Co. v. United States*, 37 C.I.T. 1295, 1312 (2013).

[52] *See Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388, 1402–03 (Ct. Int'l Trade 2021).

be inconsistent with the remedial purpose of {the statute}."[53]  Furthermore, in the case of

countervailing duties, the assumption that one country's subsidies benefited production in

another country (where the circumvention allegedly occurred) is contrary to the statute.[54]

As mentioned, Commerce conducted both antidumping and countervailing duty

investigations on CWP from Vietnam, and SSV was a mandatory respondent in those

investigations.  As a result of those investigations, Commerce made final dumping and

countervailing duty determinations with respect to CWP produced by SSV with foreign

HRC — finding a zero dumping margin in the most recent antidumping investigation and a

*de minimis* subsidy rate in the countervailing duty investigation.  Under the statutory

scheme, investigated companies with a zero or *de minimis* margin must be excluded from

---

[53] *Id*. at 1403.

[54] As Commerce has long recognized, the statute does not permit subsidies provided by a
country to be attributed to a producer in another country.  Instead, as Commerce
recognized in its 1993 "General Issues Appendix," a subsidy does not exist under the
statute if the funding for the subsidy is provided by a government of a country other than
the country in which the recipient firm is located.  *See Final Affirmative Countervailing
Duty Determination: Certain Steel Products from Austria,* 58 Fed. Reg. 37217, 37233
(July 9, 1993) (Comment 2).

We recognize that Commerce has recently amended its regulations to permit it to
countervail "transnational" subsidies in certain situations.  *See Regulations Improving and
Strengthening the Enforcement of Trade Remedies Through the Administration of the
Antidumping and Countervailing Duty Laws,* 89 Fed. Reg. 20766, 20826 and 20841
(Mar. 25, 2024).  However, that new regulation did not take effect until long after these
circumvention inquiries were completed.  And, more importantly, Commerce's attempt to
revise its previous interpretation of the statute is legally invalid, in light of Congress's
failure to overturn Commerce's 1993 decision regarding transnational subsidies when it
subsequently amended the countervailing duty statute in 1995.  As the Supreme Court has
observed, "Congress is presumed to be aware of an administrative or judicial interpretation
of a statute and to adopt that interpretation when it re-enacts a statute without change."
*Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

the antidumping or countervailing duty order.[55]  In addition, under Commerce's practice, a

company's rate continues to apply until a new rate is subsequently determined for the

company.[56]  In these circumstances, SSV should be excluded from the antidumping and

countervailing duty orders on CWP from Korea, India, and China, and its exports may not

lawfully be subject to a dumping or subsidy rate calculated for other companies in those

countries.  Commerce's decision to apply the country-wide or all-others rate from the

investigations of CWP from Korea, India, and China as the cash deposit rate for CWP

produced by SSV, improperly punishes a company that was fully investigated and was

found not to be dumping or subsidized.[57]

      B.   *The Production of Pipe from Hot-Rolled Coil Does Not*
          *Constitute a Process of "Completion" or "Assembly"*
          *Addressed by the Circumvention Provisions of the Statute*

In the final determination, Commerce improperly assumed that "completion or

assembly" of merchandise, as provided in 19 U.S.C. § 1677j(b)(1)(B), refers to the

"production" of a finished good.[58]  The legislative history for the provisions on

---

[55] *See* above at note 25.  *See also* Panel Report*, Ukraine – Anti-Dumping Measures on Ammonium Nitrate*, WTO Doc. WT/DS493/R, Add.1 and Corr.1 (circulated to WTO Members July 20, 2018) ("…the only way to terminate the investigation against a producer found to have *de minimis* dumping margin in the original investigation is to exclude that producer from the scope of the anti-dumping measures, and not to impose any anti-dumping duty on it, even at a 0% rate…").

[56] *See e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2020–2021, 88 Fed. Reg. 13088, 03089 (Mar. 2, 2023) ("…for previously investigated companies not participating in this review, the cash deposit will continue to be the company-specific rate published for the most recently completed segment of this proceeding…").

[57] *See Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 C.I.T. 1092, 1104 (2012) ("When the record cannot support the agency's determination or the agency's exercise of discretion exceeds the limits of the statute, the agency has abused its discretion.").

[58] *See* Korea I&D Memo at 22-24 (256-APPX007546-007547).

anticircumvention indicates that such a far reaching interpretation goes beyond the intent of Congress.  Commerce failed to address relevant legislative history and did not adequately explain how "production" of a finished good constitutes "assembly or completion."  This Court must ensure that Commerce's decisions fully address the arguments presented to it and that the antidumping statute is implemented in such a manner that comports with Congress's intent.

### 1. Production of Pipe from Steel Coils Does Not Constitute "Assembly"

The circumvention provisions permit merchandise to be included within the scope of an antidumping order if, before importation to the United States, such imported merchandise is "completed or assembled" in another foreign country before importation to the United States.[59]  The dictionary defines the verb "assemble" as meaning "to fit together the parts of" an item.[60]  Since the production of CWP from imported hot-rolled coil does not involve "fitting parts together," that production does not constitute "assembly."  Consequently, the production of pipe from imported coil may only considered circumvention if that production constitutes a process of "completion" within the meaning of the statute.

### 2. Production of Pipe from Steel Coils Does Not Constitute "Completion" of an Incomplete Item

"Complete," as a verb, is defined by the dictionary as meaning "to bring to an end and especially into a perfected state" or "to make whole or perfect."[61]  Before an item is

---

[59] *See* 19 U.S.C. § 1677j(b)(1)(B).

[60] *See* «www.merriam-webster.com/dictionary/assemble».

[61] *See* « www.merriam-webster.com/dictionary/complete ».

"completed," it is "incomplete."  Thus, the dictionary defines "incomplete" as "not complete : unfinished: such as ... lacking a usually necessary part, element, or step."[62] These definitions indicate that "completion" refers only to the final step of transforming an "incomplete" item into a finished product.[63]

The legislative history fully supports this interpretation.  The anticircumvention provisions of the 1988 Omnibus Act were not adopted in a vacuum.  Instead, they were intended to address specific problems that had arisen in the Department's administration of the antidumping laws.  Although the Department had taken action to address what it perceived to be circumvention, its actions lacked statutory authority and required departures from established judicial precedent.  Congress therefore stepped in to clarify the Department's authority.

In this regard, the legislative history makes clear that the provisions on merchandise "completed or assembled" in the United States and third countries were intended to address a specific situation that had arisen under the antidumping orders on Color Televisions.  Those orders, by their terms, explicitly covered television receivers, whether "complete or incomplete."  However, exporters had responded to the orders by establishing facilities in the United States and other countries that assembled the finished televisions using key components — the color picture tubes and printed circuit boards — from the country subject to the order.  The exporters argued that the picture tubes and circuit boards that were imported into the United States in separate shipments for U.S. production could not

---

[62] *See* « www.merriam-webster.com/dictionary/incomplete ».

[63] As the Supreme Court has observed, "it is a 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'"  *Taniguchi v. Kan Pacific Saipan*, 566 U.S. 560, 571 (2012) (citations omitted).

be subject to antidumping duties under the well-established Customs "doctrine of the entireties," which held that separately imported items had to be classified based only on the items contained in each entry, and not based on the contents of other, distinct entries with which they were later combined.

In a 1986 scope ruling, the Department held that separately-imported picture tubes and printed circuit boards into the United States in separate shipments constituted "incomplete" televisions that fell within the scope of the antidumping order.[64]  The Department then preliminarily reversed that position in a March 1987 preliminary determination in a changed circumstances review, which held that the separately imported picture tubes were subject to a separate investigation on Color Picture Tubes.[65]  That position was then reversed in the final July 1987 determination in the changed circumstances review.[66]

At the time that the 1988 Omnibus Act was under consideration, there was a great deal of uncertainty about the lawfulness of Commerce's decision that separately imported picture tubes and printed circuit boards could be classified as "incomplete televisions" for antidumping purposes.  The anticircumvention provisions were adopted in 1988

---

[64] *See Color Television Receivers from Korea; Antidumping Duty Order*, 49 Fed. Reg. 18336 (Apr. 30, 1984), and "Clarification of Scope and Analysis of Comments on the Department's Telex Suspending Liquidation on Korean Printed Circuit Boards and Korean Picture Tubes," Memorandum from Laura Merchant to Richard W. Moreland (Oct. 17, 1986).  A copy of this scope memorandum was provided in Attachment 1 of SeAH VINA's June 1, 2023, Second Case Brief (256-APPX007331-007348).

[65] *See Color Television Receivers from Korea: Intention to Review and Preliminary Results of Changed Circumstances Administrative Review and Tentative Determination To Revoke Antidumping Duty Order*, 52 Fed. Reg. 6840 (Mar. 5, 1987).

[66] *See Color Television Receivers from Korea: Final Results of Changed Circumstances Review and Determination Not to Revoke Antidumping Duty Order*, 52 Fed. Reg. 24500 (July 1, 1987).

specifically to clarify Commerce's authority to address the situation that had arisen in the

Color Televisions case.  Thus, the House Committee Report on the bill that introduced the

anticircumvention provisions referred specifically to the televisions case as the basis for

the provisions addressing U.S. and third-country production:

> The bill adds a new section … to address two types of circumvention:
> (1) the importation of parts or components to be assembled in the
> United States into the class or kind of merchandise covered by the
> order, such as when picture tubes and printed circuit boards are
> shipped by the manufacturer to a related subsidiary in the United
> States to be assembled and then sold as a television receiver ….[67]

The history of the *Color Televisions* case — and its classification of "incomplete"

televisions as within the scope of the order on the finished product — therefore provides

critical context for understanding the meaning of the statutory provision.  In particular, the

term "completed or assembled" must be understood as the process by which an

"incomplete" product is turned into a finished item.

Significantly, the 1988 Omnibus Act also contained a provision defining the concept

of an "incomplete" item, and explaining when such items could be classified in the same

manner as the "completed" item.  Subtitle B of Title I of that Act repealed the old Tariff

Schedule of the United States ("TSUS") and replaced it with the new Harmonized Tariff

Schedule of the United States ("HTSUS").[68]  One of the changes adopted by the Act

concerned the rules of interpretation applicable to "unfinished" products.  The General

Interpretative Rules of the TSUS had authorized Customs to classify an "unfinished" item

under the same classification as the "finished item, but had provided no specific guidance

---

[67] H. Rept. No. 100-40, Part 1 at 134.

[68] The anticircumvention provisions were adopted in Subtitle C of Title I of the 1988
Omnibus Act.  *See* Pub. L. No. 100-418 (August 23, 1988).

as to when that classification might be appropriate.[69]  By contrast, the General Rules of
Interpretation under the HTSUS added the concept of "incomplete" articles and
specifically addressed the circumstances in which an "incomplete" article might be
classified in the same manner as the completed item.  Thus, Rule 2(a) of the HTSUS's
General Rules of Interpretation provides that:

> Any reference in a heading to an article shall be taken to include a
> reference to that article *incomplete or unfinished*, provided that, as
> entered, *the incomplete or unfinished article has the essential
> character of the complete or finished article*. It shall also include a
> reference to that article complete or finished (or falling to be classified
> as complete or finished by virtue of this rule), entered *unassembled or
> disassembled.*[70]

Under this provision, an "incomplete" article must already have the "essential character" of
the completed item.

Taken as a whole, the legislative history and the statutory context confirm that
Congress was referring to a specific concept when it used the term "completed or
assembled" in the anticircumvention provisions.  It did not use a term — such as
"produced" or "manufactured" — that would have encompassed any and all production
processes.  Instead, it used a more narrow term "complete" to refer to situations in which

---

[69] Thus General Interpretative Rule 10(h) of the TSUS provided that:

> …unless the context requires otherwise, a tariff description for an
> article covers such article, whether assembled or not assembled, and
> whether finished or not finished.

Tariff Schedule of the United States, General Headnotes and Rules of Interpretation,
Headnote 10(h).  There were court cases addressing the application of this principle to
finished products that were assembled from parts.  Under those decisions, "parts of an
article may be classified as the unfinished article itself only when the imported pieces
constitute a substantially complete article."  *See, e.g., Daisy-Heddon v. United States,* 600
F.2d 799, 802 (C.C.P.A. 1979).

[70] HTSUS, Gen. R. Interp. 2(a).

an unfinished item that already had the essential characteristics of the finished good was

transformed into the finished good.  Because steel coils do not have the "essential

characteristics" of steel pipe, the production of pipe from imported coils does not

constitute "completion" of steel pipe within the meaning of the statute.

Commerce's Final Determination simply failed to address the statutory definition of

"incomplete" merchandise and how that term provided context for interpreting the concept

of "completion" in the circumvention provision of the statute.  It also failed to address any

of the legislative history providing guidance as to the interpretation of the concept of

"completion."  In the absence of any explanation as to how its interpretation can be

reconciled with this statutory language, Commerce's determination cannot be upheld.[71]

> 3.  *The Legislative History Confirms that Processing*
>     *Would Constitute Circumvention Only When It*
>     *Involved Nothing More than a "Slight Change"*
>     *in the "Method of Production or Shipment"*

The legislative history also provides additional guidance concerning the type of

processing that might constitute "circumvention" under the statute.  According to the Ways

and Means Committee's report, the circumvention provisions were adopted because:

> The Committee is concerned about the increasing instances in
> numerous product sectors, of circumvention and evasion of
> antidumping ... and countervailing duty orders.  Under present law,
> parties subject to these orders have often been able *to circumvent or*
> *evade the order by making slight changes in their method of*
> *production or shipment* of the merchandise destined for consumption
> in the United States.  As a result, the existence of these "loopholes"
> has seriously undermined the effectiveness of the remedies provided

---

[71] *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
29, 43 (1983) ("{A}n agency rule would be arbitrary and capricious if the agency
has…entirely failed to consider an important aspect of the problem, offered an explanation
for its decision that runs counter to the evidence before the agency, or is so implausible
that it could not be ascribed to a difference in view or the product of agency expertise.").

> by the antidumping and countervailing duty proceedings and frustrated
> the purpose for which these laws were enacted.[72]

In short, the circumvention provisions were intended to apply when the changes to

production were "slight," and sought to take advantage of a "loophole" in the coverage of

an existing order.

In this case, however, it is clear that the "changes" in the pipe-production process

represented by SSV's manufacturing were not "slight." There is nothing in the

antidumping order on CWP from Korea that requires that only pipe made from Korean

steel coils will be within the scope of that order. To the contrary, any pipe produced in

Korea by SSV's parent that meets the characteristics of CWP is within the scope of the

order, even if that pipe is produced using steel coils from China, India, Japan, or other

countries. SSV's Korean parent does not produce its own steel coils and therefore must

purchase the coils it uses from other suppliers. Consequently, SSV's production of pipe

using steel coils purchased from the same suppliers was not a "slight change" in the

production process. Instead, it meant that the *entire* production process for SSV's Korean

parent had been transferred to Vietnam. Such a transfer simply does not constitute

circumvention under the statute.

> 4.    *The Legislative History Indicates that, for Pipe Products,*
> *Congress Contemplated that Only Minor Finishing Operations*
> *Would Fall Within the Ambit of the Circumvention Provisions*

Finally, it should be noted that questions about the applicability of the circumvention

provisions of the statute to steel pipe products were not wholly unexpected when those

provisions were adopted. To the contrary, the legislative history of the 1988 Omnibus Act

that added the circumvention provisions of the statute explicitly addressed the possibility

---

[72] H. Rept. No. 100-40, Part 1, at 134 (emphasis added).

that steel pipe might be the subject of such circumvention.  Thus, the House Ways and Means Committee reported that:

> The bill adds a new section ... to address two types of circumvention: (1) the importation of parts or components to be assembled into the class or kind of merchandise covered by the order, such as when picture tubes and printed circuit boards are shipped by the manufacturer to a related subsidiary to be assembled and then sold as a television receiver; (2) the importation of an incomplete or unfinished article to be completed in the United States, by means other than assembly, into the class or kind of merchandise covered by the order, *such as when steel pipe is imported by a related party that threads it and sells it as threaded pipe*.[73]

It is clear, therefore, that the Ways and Means Committee was concerned about the possibility that imported pipe might somehow circumvent an existing order.  But the type of processing that the Ways and Means Committee considered circumvention was far different from the process of forming pipe from steel coils.  According to the Ways and Means Committee, circumvention (through a process of assembly or completion) would occur when pipe from a country subject to an order that was complete in all other respects was subjected to a process of *threading* in another country.

 The process of threading consists of cutting grooves into the end of a pipe to allow a coupling to be screwed onto the end — in the same manner that a cap is screwed onto the top of a soda bottle.  Before threading, the unthreaded pipe has all of the "essential characteristics" of the finished product.  It simply lacks the grooves that will allow it to be screwed together with other pieces of pipe.  The reference to threading as a possible form of "completion" that might constitute circumvention is, therefore, consistent with the statutory definition of the term "incomplete" — which, as explained above, indicates that

---

[73] *Id.* at 134 (emphasis added).

an "incomplete" article must have "the essential character of the complete or finished article."[74]  By the same token, the failure of the Ways and Means Committee to address the production of pipe from imported steel coils when discussing possible circumvention of orders on pipe confirms that such production was never considered to be a process of "completion" within the meaning of the circumvention provisions.

C.  *Production Operations by a Foreign Producer that Are Essentially Identical to the Operations Performed by the U.S. Producers Seeking the Circumvention Inquiry Cannot Be Considered "Minor" or "Insignificant"*

As described above, the CWP at issue in this appeal is produced by slitting hot-rolled steel coils to a desired width, forming the strips of slit steel into a tubular shape, welding the edges of the strips together, cutting the resulting pipe to the desired length, and then finishing the pipe with operations like threading.[75]  Significantly, the evidence confirms that the U.S. producers that requested these inquiries employ the same processes as SSV and its Korean parent.  The U.S. producers do not themselves produce the steel coils used in production.  Instead, they purchase coils from other suppliers.[76]  In fact, the holding company that owns the U.S. producers Wheatland Tube Company and Atlas Tube, Inc., told the Securities and Exchange Commission that it was "the largest consumer of HRC by volume in the United States" and that a significant volume of its purchased hot-rolled coils came from "foreign supply sources."[77]

---

[74] *See* above at 32.

[75] *See* above at note 6.

[76] *See* SeAH VINA's March 10, 2023, Resubmission of Factual Information (256-APPX006618).

[77] *See id.*, at Attachment 1-D (256-APPX006662).

Under the statutory provisions, Commerce may take action against third-country production only when it finds that the process of assembly or completion in the third country is "minor" or "insignificant."[78]  The statute identifies that certain factors that must be considered by Commerce when deciding whether the third-country production process is "minor" or "insignificant,"[79] but it does not indicate that Commerce is limited to a consideration of those factors.

In this regard, the production processes employed by the U.S. producers that have requested the anticircumvention measures is plainly relevant to a determination whether a production process is "minor" or "insignificant."  The U.S. producers certainly have no legitimate grounds to complain about the limited production processes performed by their foreign competitors when their production processes are no more substantial.  If SSV's operations are "minor" or "insignificant," then the U.S. producers' are as well, and those producers have no standing to claim to be part of the U.S. industry producing CWP.[80]

---

[78] *See* 19 U.S.C. § 1677j(b)(1)(C).

[79] *See* 19 U.S.C. § 1677j(b)(2).

[80] The ITC has held that "production-related activity at minimum levels could be insufficient to constitute domestic production."  *See, e.g., Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 at 12-13 (Nov. 2012), aff'd, *Changzhou Trina Solar Energy v. USITC*, 879 F. 3d 1377 (Fed. Cir. 2018).

    D.   *Commerce's Expansion of the Orders to Cover*
         *SSV's Production Was Unlawful When None of the*
         *Factors Commerce Is Required to Consider under*
         *19 U.S.C. § 1677j(b)(3) Supported that Expansion*

        1.   *Commerce May Only Expand the Coverage an Order*
            *under the Circumvention Provisions If the Factors Set*
            *Forth in 19 U.S.C. § 1677j(b)(3) Support Such Expansion*

The statute, in 19 U.S.C. § 1677j(b)(1), establishes the criteria that must be satisfied

before Commerce may expand the coverage of an order to encompass third-country

production. Subsection (E) of that provision establishes that such action is permitted only

if "the administering authority determines that action is appropriate under this paragraph to

prevent evasion of such order or finding." This Court has previously held that Commerce

may not take anticircumvention action unless all of the requirements of 19 U.S.C.

§ 1677j(b)(1), including the requirements of subsection (E), are satisfied.[81]

The statute also provides explicit guidance to Commerce regarding the factors to be

considered when making a determination under subsection (E) of 19 U.S.C. § 1677j(b)(1).

In particular, 19 U.S.C. § 1677j(b)(3) provides that:

---

[81] *See Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1365 (Ct. Int'l
Trade 2021), aff'd, 65 F.4th 1351 (Fed. Cir. 2023) ("To find that imported merchandise
completed in a third country falls within the scope of the AD/CVD order, Commerce must
show that the merchandise meets all the criteria under section 1677j(b)(1)."); *Bell Supply
Co., LLC v. United States*, 83 F. Supp. 3d 1311, 1325 (Ct. Int'l Trade 2015) ("Section
1677j(b) requires Commerce to make five findings in order to include merchandise not
already included in an antidumping or countervailing duty order because it is completed or
assembled in other foreign countries and subsequently imported into the United States. Id.
§ 1677j(b)(1)(A)-(E)."). *See also Peer Bearing Co.-Changshan v. United States,* 986 F.
Supp. 2d 1389, 1402 (Ct. Int'l Trade 2014) ("Moreover, Congress did not consider it
appropriate to allow Commerce to expand the scope of an antidumping duty order pursuant
to § 1677j(b) without placing on that authority the restrictions that are set forth in
§ 1677j(b)(1)(C)-(E)."); *Peer Bearing Co.-Changshan v. United States*, 986 F. Supp. 2d
1389, 1403 (Ct. Int'l Trade 2014) ("Moreover, Congress did not consider it appropriate to
allow Commerce to expand the scope of an antidumping duty order pursuant to § 1677j(b)
without placing on that authority the restrictions that are set forth in § 1677j(b)(1)(C)-
(E).").

PUBLIC VERSION

> In determining whether to include merchandise assembled or completed in a foreign country in a countervailing duty order or an antidumping duty order or finding under paragraph (1), the administering authority shall take into account such factors as—
>
> (A)  the pattern of trade, including sourcing patterns,
>
> (B)  whether the manufacturer or exporter of the merchandise described in paragraph (1)(B) is affiliated with the person who uses the merchandise described in paragraph (1)(B) {*i.e.,* the materials imported into the third-country from the countries subject to the existing orders} to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States, and
>
> (C)  whether imports into the foreign country of the merchandise described in paragraph (1)(B) have increased after the initiation of the investigation which resulted in the issuance of such order or finding.[82]

In this case, Commerce purported to consider the three required factors, but claimed they were "mixed and inconclusive."[83]  Commerce claimed, therefore, that it had based its decision to expand the scope of the order on "other factors," but never explained what those other factors might be.[84]  In reality, there were no "factors" that supported expansion of the order to cover SSV's exports.  To the contrary, the evidence on all three of the factors Commerce is required to consider indicated that anticircumvention action was not

---

[82] 19 U.S.C. § 1677j(b)(3).

[83] *See* Korea Prelim at 23 (256-APPX007024); Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Decision Memorandum for the Circumvention Inquiry on the Antidumping Duty Order ("India Prelim"), April 6,2023, at 22-23 (257-APPX007036-007037); Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Preliminary Decision Memorandum for the Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders ("China Prelim"), April 6, 2023, at 24 (258-APPX007059).

[84] *See* Korea Prelim at 20 (256-APPX007021); India Prelim at 20 (257-APPX007034); China Prelim at 21-22 (258-APPX007056-007057).

appropriate.  In these circumstances, Commerce's decision to nevertheless expand the

scope of the order was contrary to law and unsupported by the evidence on the record.

>    2.    *None of the Relevant Factors Supported*
>          *Expansion of the Orders to SSV's Products*

>         a.    *The "Pattern of Trade, Including Sourcing*
>               *Patterns," Did Not Support Commerce's*
>               *Expansion of the Orders to Cover SSV Products*

In its previous decisions, Commerce has determined whether the "pattern of trade"

supports anticircumvention action by comparing the trend in imports into the United States

of the finished product from the country or countries subject to the order with the trend in

imports into the United States of the finished product from the third country in which

circumvention is allegedly occurring.  Commerce takes circumvention action only when

imports from the third-country have increased much faster than the imports from the

countries subject to the order.  According to Commerce¸ "a clear changing pattern of

trade" is required "for affirmative circumvention determinations."[85]

---

[85] *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 Fed. Reg. 52507 (August 26, 2022), unchanged in *Certain Welded Carbon Steel Standard Pipes and Tubes From India: Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 Fed. Reg. 12917 (March 1, 2023), and its accompanying Preliminary Decision Memorandum at 22.  *See also Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 8841 (February 18, 2020), unchanged in *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41957 (July 13, 2020); *Certain Uncoated Paper from Brazil: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Uncoated Paper Rolls*, 86 Fed. Reg. 7261 (January 27, 2021), unchanged in *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia: Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Roll*, 86 Fed. Reg. 71025 (December 14, 2021); and *Oil Country Tubular Goods from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention*, 86 Fed. Reg. 43627 (August 10, 2021),

*(footnote continued on following page)*

But the relevant comparison in this case demonstrates that SSV's exports of CWP from Vietnam did not increase at all.  On an aggregate basis, SSV's exports actually *fell* by [    ] percent over the period considered by Commerce — from [          ] metric tons in 2017 to [          ] metric tons in 2021.[86]  A decrease in total exports to the United States by the third-country producer is simply not consistent with a claim that the third-country producer is circumventing an order.

Taken as a whole, then, the data on patterns of exports of CWP from Vietnam, Korea, China, and India did not support the conclusion that CWP producers in countries subject to antidumping or countervailing duty orders were circumventing the existing orders by selling hot-rolled steel coils to SSV for use in SSV's production of CWP.  Significantly, Commerce did not claim that the patterns of trade supported a finding of circumvention. Instead, it found only that the absence of a pattern of trade consistent with circumvention was not "dispositive," because "Commerce finds that in this instance, placing more weight on the patterns of trade is not appropriate when other factors support an affirmative determination."[87]

---

*(footnote continued from previous page)*
unchanged in *Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determinations of Circumvention*, 86 Fed. Reg. 67443 (November 26, 2021).

[86] *See* SSV's December 15, 2022, Supplemental Questionnaire Response, Appendix S-22 (256-APPX006258, 256-APPX085422).

[87] *See, e.g.,* Korea I&D Memo at 38 (256-APPX007562).

b. *There Is No Affiliation between SSV and Producers*
*of Hot-Rolled Steel Coils in Korea, China or India*

In its final determination, Commerce conceded that "SeAH VINA is not affiliated

with any company located in the subject country that produces HRC."[88]  Once more

Commerce did not suggest that this lack of affiliation supported an anticircumvention

action.  Instead, Commerce held only that the lack of affiliation was not dispositive

because "a lack of affiliation under section 781(b)(3)(B) of the Act, in itself, does not

outweigh our determination that the statutory criteria under sections 781(b)(1)(A)-(D) of

the Act {*i.e.,* 19 U.S.C. §1677j(b)(1)(A) to (D)} have been satisfied, and the remaining

elements under section 781(b)(3) of the Act {*i.e.,* 19 U.S.C. §1677j(b)(3)} otherwise did

not detract from a finding that an action is appropriate pursuant to section 781(b)(1)(E) of

the Act."[89]

c. *Pattern of Imports into Vietnam of Materials*
*from the Countries Subject to the Orders*

Having found that neither the pattern of trade nor the absence of affiliations between

SSV and its hot-rolled coil suppliers would support anticircumvention action, the only

remaining factor to be considered under 19 U.S.C. 1677j(b)(3) was the pattern of the input

material (hot-rolled coils) from the countries subject to the orders into Vietnam.  But the

data on SSV's purchases of hot-rolled coils from Korea, China, and India is also

inconsistent with any claim of circumvention.  SSV's total imports of hot-rolled coils from

all sources were [      ] percent lower in 2021 than they had been in 2017.[90]  On a country-

---

[88] *See, e.g.,* Korea I&D Memo at 35 (Comment 8) (256-APPX007559).

[89] *See, e.g., id.*

[90] *See, e.g.,* Initial Response, Appendix 10 (256-APPX002229-002230, 256-APPX080671-080672).

specific basis, SSV's purchases of hot-rolled coils from Korea in 2021 were [    ] percent lower than they had been in 2017,[91] and its purchases of hot-rolled coils from China were [    ] percent lower than they had been in 2017.[92]  While SSV's purchases of hot-rolled coils from India were higher in 2021 than they had been in 2017, the increased imports from India necessarily were used in the production of products other than CWP exported to the United States, since (as mentioned above) SSV's total exports of CWP produced using India hot-rolled coils to the United States fell by [    ] percent.[93]  And, in any event, an increase in hot-rolled coil imports from India alone cannot plausibly support a finding that SSV was circumventing orders on Korea and China, especially when SSV's total imports of Korea, China, and all other sources were decreasing over the period.

> 3. *Commerce Did Not Identify Any Other Factors that Supported Expansion of the Coverage of the Orders to SSV's Products*

As demonstrated above, neither the patterns or trade, nor the evidence on affiliation, nor the patterns of imports into Vietnam of materials from the countries subject to the orders supported Commerce's determination to take anticircumvention action in this case. It is true that the statute does permit Commerce to rely on "other factors" beyond the three

---

[91] SSV's purchases of hot-rolled coils from Korea totaled [        ] metric tons in 2017 and [        ] metric tons in 2021.  *See* Korea Preliminary Analysis Memorandum at 6 (256-APPX007037, 256-APPX086241).

[92] SSV's purchases of hot-rolled coils from China totaled [        ] metric tons in 2017 and [        ] metric tons in 2021.  *See* China Preliminary Analysis Memorandum at 7 (258-APPX007075, 258-APPX087958).

[93] SSV's U.S. sales of CWP produced from hot-rolled coils from India decreased from [    ] MTs in 2017 to [    ] MTs in 2021.  *See* India Preliminary Analysis Memorandum at 6 (257-APPX007049, 257-APPX086134).

specified in the statute when deciding whether or not to take anticircumvention action.[94]

But, if Commerce is to rely on such "other factors," it must identify what those factors are

and explain why the evidence on the record concerning those factors supports

anticircumvention action. A mere assertion that the "totality of the circumstances"

supports Commerce's action is, without more, legally inadequate.[95]

In this case, Commerce completely failed to identify what "other factors" and what

record evidence supported its decision to take anticircumvention action against SSV's

exports. In such circumstances, Commerce's determination cannot be sustained.

---

[94] In particular, the statute requires Commerce to consider factors such as the three
explicitly enumerated in the statute. *See* 19 U.S.C § 1677j(b)(3).

[95] *See, e.g., Hyundai Steel v. United States*, 415 F. Supp. 3d 1293, 1301 (Ct. Int'l Trade
2019) ("Not even {unsubstantiated allegations'} collective impact can fill the evidentiary
void…"); *NEXTEEL v. United States*, 355 F. Supp. 3d 1336, 1351 (Ct. Int'l Trade 2019)
("It does not stand to reason that individually, the facts would not support a particular
market situation, but when viewed as a whole, these same facts could support the opposite
conclusion. The court concludes that Commerce's determination of the existence of one
particular market situation in Korea is unsupported by substantial evidence.").

C<small>ONCLUSION</small>

For the foregoing reasons, we respectfully request that the Court grant SSV's motion

for judgment on the agency record, and remand this matter to Commerce for disposition in

a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan
Vi N. Mai
Jooyoun Jeong
Ruby Rodriguez

W<small>INTON</small> & C<small>HAPMAN</small> PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Attorneys for SeAH Steel VINA Corporation

June 17, 2024

CERTIFICATE OF COMPLIANCE

    Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 12,011 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


                                      /s/   Jeffrey M. Winton

June 17, 2024