UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| SEAH STEEL VINA CORPORATION, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>UNITED STATES, )<br><br>*Defendant,* )<br><br>*and* )<br><br>BULL MOOSE TUBE COMPANY; MARUICHI )<br>AMERICAN CORPORATION; WHEATLAND )<br>TUBE COMPANY; THE UNITED STEEL, PAPER )<br>AND FORESTRY, RUBBER, MANUFACTURING, )<br>ENERGY, ALLIED INDUSTRIAL AND SERVICE )<br>WORKERS INTERNATIONAL UNION, AFL-CIO, )<br>CLC; NUCOR TUBULAR PRODUCTS INC., )<br><br>*Defendant-* )<br>*Intervenors.* )<br> ) | Court Nos. 23-256, 23-257<br>and 23-258 |

REPLY BRIEF OF
PLAINTIFF SEAH STEEL VINA CORPORATION

PUBLIC DOCUMENT

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C.  20005
+1.202.774.5500

Attorneys for SeAH Steel VINA Corporation

January 13, 2025

Table of Contents

Page

ARGUMENT ................................................................................................................ 2

   A.   Commerce's Statutory Interpretation
      Is Not Entitled to Deference ................................................................... 2

   B.   The Statute Does Not Permit Commerce to Include
      Previously Investigated Products that Resulted in
      Negative Antidumping and Countervailing Duty
      Determinations in a Circumvention Determination ............................... 3

      1.   Commerce Must Consider its Previous Final
         Determinations Before Initiating a Circumvention Inquiry ........... 3

      2.   The Statute Does Not Support Including SSV's CWP
         in an Affirmative Circumvention Determination .......................... 5

         a.   The Plain Meaning of the Circumvention Statute
            Must be Derived from the Overall Statutory Scheme ........................... 6

         b.   Failure to Consider Negative Investigation
            Determination Inconsistent with Treatment
            of Affirmative Investigation Determination ........................................... 8

         c.   Prohibition of Circumvention Inquiries on
            Products Subject to Previous Negative
            Determinations Does Not Create a De Facto
            Exception that Is Contrary to the Statute .............................................. 9

         d.   The Differences in the Periods Examined Does Not Justify
            Allowing Anticircumvention Action against Products
            Previously Found Not To Be Dumped or Subsidized ....................... 11

   C.   Commerce Was Not Permitted to Apply the
      Dumping and Subsidy Rates from the China,
      Korea, and India Investigations to SSV's CWP Exports ..................... 12

   D.   Commerce's Determination Failed to Meet
      All Criteria Required by Section 1677j(b) ........................................... 14

      1.   SSV's Production Process Is
         Not "Completion or Assembly" ................................................. 15

         a.   CAFC Decision in Bell Supply Does not
            Preclude Use of the Essential-Character Test ..................................... 16

Page

   b. Other Court Decisions Cited by Defendant-Intervenors Are
    Distinguishable and Inapplicable to the Facts of this Case ................ 16

   c. The Essential-Character Test Does
    Not Create Surplusage in the Statute .................................................... 19

   d. Examples in Legislative History Support
    Use of Essential-Character Test ........................................................... 19

   e. Limiting "Completed or Assembled" to
    the Last Processing Step is Workable .................................................. 20

  2. SSV's Production Process Is
   Not "Minor or Insignificant" ........................................................................ 21

  3. Additional Factors Set Forth in Subsection (b)(3) Do Not
   Support Conclusion that "Appropriate" to "Prevent Evasion" .................. 24

CONCLUSION ..................................................................................................................... 27

Table of Authorities

C<small>OURT</small> D<small>ECISIONS</small>

*Al Ghurair Iron & Steel LLC v. United States,*
    536 F. Supp. 3d 1357 (CIT 2021) ......................................................... 10, 17

*Al Ghurair Iron & Steel LLC v. United States,*
    65 F.4th 1351 (Fed. Cir. 2023) .................................................................... 23

*American Spring Wire Corp. v. United States,*
    7 CIT 2, 578 F.Supp. 1405 (1984) ................................................................. 7

*Bell Supply Co., LLC v. United States,*
    888 F.3d 1222 (Fed. Cir. 2018) ................................................................... 16

*Bostock v. Clayton Cnty., Georgia,*
    590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020) .............................. 9

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ....................................... 14

*Dubin v. United States,*
    599 U.S. 110, 143 S. Ct. 1557, 216 L. Ed. 2d 136 (2023) ............................ 10

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ..................................................................................... 15

*Forest Int'l Acquisition, Inc. v. United States,*
    497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ................................................ 13

*Garg Tube Exp. LLP v. United States,*
    No. 21-00169, 2024 WL 4799475 (CIT Nov. 7, 2024) ........................... 2, 15

*Hibbs v. Winn,*
    542 U.S. 88 (2004) ......................................................................................... 8

*Hlds (B) Steel Sdn Bhd v. United States,*
    No. 21-00638, 2024 WL 244937, (CIT Jan. 23, 2024) ................................. 18

*Home Depot U.S.A., Inc. v. United States,*
    435 F. Supp. 3d 1311 (CIT 2020)) .............................................................. 16

*Hylsa, S.A. de C.V. v. United States,*
    960 F. Supp. 320 (CIT 1997) ......................................................................... 5

*King v. St. Vincent's Hosp.,*
    502 U.S. 215, 112 S. Ct. 570, 116 L. Ed. 2d 578 (1991) ................................ 6

Page

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024) .............................................. 2

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................ 27

*NEXTEEL v. United States,*
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ................................................. 41

*NTN Bearing Corp. of Am. v. United States,*
    26 CIT 53, 186 F.Supp.2d 1257 (2002) .................................................... 6, 14

*Sandoz Chemicals Corp. v. United States,*
    17 C.I.T. 1061 (1993) ....................................................................................... 7

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001) ..................................................................... 24

*Universal Camera Corp. v. N.L.R.B.*,
    340 U.S 474 (1951) ....................................................................................... 22

STATUTES AND REGULATIONS

19 U.S.C. § 1673a ................................................................................................. 4

19 U.S.C. § 1677b ............................................................................................... 14

19 U.S.C. § 1677j ......................................................................................... *passim*

CONGRESSIONAL MATERIALS

H. Rept. No. 100-40, Part 1 (1987) .................................................................. 20

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| SEAH STEEL VINA CORPORATION, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| *and* ) | |
| ) | Court Nos. 23-256, 23-257 |
| BULL MOOSE TUBE COMPANY; MARUICHI ) | and 23-258 |
| AMERICAN CORPORATION; WHEATLAND ) | |
| TUBE COMPANY; THE UNITED STEEL, PAPER ) | |
| AND FORESTRY, RUBBER, MANUFACTURING, ) | |
| ENERGY, ALLIED INDUSTRIAL AND SERVICE ) | |
| WORKERS INTERNATIONAL UNION, AFL-CIO, ) | |
| CLC; NUCOR TUBULAR PRODUCTS INC., ) | |
| ) | |
| *Defendant-* ) | |
| *Intervenors.* ) | |

REPLY BRIEF OF
SEAH STEEL VINA CORPORATION

This reply brief is submitted on behalf of SeAH Steel VINA Corporation ("SSV") in reply to the Response Briefs submitted by the Government on September 23, 2024, and Defendant-Intervenors on October 15, 2024, in the appeal of the final determinations by the U.S. Department of Commerce in its circumvention inquiries concerning Circular Welded Non-Alloy Steel Pipe ("CWP") produced in Vietnam using hot-rolled steel coils ("HRC") purchased from suppliers in China, Korea, or India.

<u>ARGUMENT</u>

A.   *Commerce's Statutory Interpretation*
     *Is Not Entitled to Deference*

The Government's and Defendant-Intervenors' briefs each claim to address the

standard of review.[1]  Missing from their discussion is the relevant standard of review of an

agency's statutory interpretation.  As the Court is aware, after SSV's initial brief (but

before the Government's and Defendant-Intervenors' briefs) the Supreme Court overruled

the deferential *Chevron* standard of review.[2]  Under the Supreme Court's decision in *Loper*

*Bright*,

> Courts {must} exercise their independent judgment in deciding
> statutory meaning.  In doing so, courts use traditional tools of statutory
> interpretation, specifically courts examine the "statute's text, structure,
> and legislative history, and apply the relevant canons of interpretation."
> Starting with the text, the plain meaning of the word is ascertained in
> context. Dictionary definitions, although helpful, are not solely
> dispositive, and must be weighed considering the statute as a whole.[3]

This Court must, therefore, apply this new standard of review to evaluate

whether Commerce's interpretation of the circumvention statute was permissible.

As explained in SSV's initial brief and further in this reply brief, Commerce's

circumvention determination does not comport with the statute and must be

reversed.

---

[1] *See* Government's Brief, ECF No. 42, at 12-13 and Defendant-Intervenor's Brief, ECF
No. 44, at 11.

[2] *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L. Ed. 2d
832 (2024).

[3] *Garg Tube Exp. LLP v. United States*, No. 21-00169, 2024 WL 4799475, at *7–8 (CIT
Nov. 7, 2024) (internal citations omitted).

B.    *The Statute Does Not Permit Commerce to Include Previously
       Investigated Products that Resulted in Negative Antidumping and
       Countervailing Duty Determinations in a Circumvention Determination*

As explained in SSV's initial brief, CWP from Vietnam (made with HRC from any country) were the subject to antidumping and countervailing duty investigations in 2011 and another antidumping investigation in 2015.  In the countervailing duty investigation, Commerce found only *de minimis* subsidies to SSV.  In the most recent antidumping investigation, Commerce found a *zero* dumping margin for SSV.[4]

The language of the statute, the overall statutory scheme, and intent of Congress all demonstrate that the circumvention provision of the statute cannot be applied to products that were previously investigated by Commerce and found not to have been dumped or subsidized.  Instead, the statute requires a new investigation before antidumping or countervailing duties may be applied to such products.  As a result, no antidumping or countervailing duty orders were permitted to be issued on CWP from Vietnam.

The Government and Defendant-Intervenors argue that the plain meaning of the statute does not require Commerce to consider the effect of a negative investigation determination when initiating a circumvention inquiry or reaching an affirmative circumvention determination.  Their assertion is incorrect.

1.    *Commerce Must Consider its Previous Final
       Determinations Before Initiating a Circumvention Inquiry*

The Government asserts that Commerce properly initiated the circumvention inquiries on SSV's CWP products based on the following syllogism:

---

[4] *See* SSV's Initial Brief, ECF Nos. 38 and 39, at 11-13.

(1)   Commerce's *regulations* identifying the criteria for initiating a circumvention inquiry mirror the requirements set forth in the circumvention provisions of the statute.

(2)   The circumvention provisions of the statute do not explicitly state that Commerce must consider previous negative investigation determinations in a circumvention inquiry.

(3)   Therefore, Commerce was not required to consider its previous negative dumping and subsidy determinations related to SSV's CWP exports before initiating the inquiry.[5]

The Government's argument, however, rests on the false assumption that the statute identifies the criteria for initiating a circumvention inquiry.  It does not.

Congress has been explicit whenever it identified the criteria for initiating proceedings under the Trade Act.  For example, Section 1673a is titled "Procedures for initiating an antidumping duty investigation" and states the following:

> An antidumping duty investigation *shall be initiated* whenever the administering authority determines, from information available to it, that a formal investigation is warranted into the question of whether the elements necessary for the imposition of a duty under section 1673 of this title exist.[6]

By contrast, Congress did not include any provision identifying the criteria necessary to initiate a circumvention inquiry when it adopted the circumvention provisions in Section 1677j.[7]

---

[5] *See* Government's Brief at 20-21.

[6] 19 U.S.C. § 1673a(a)(1) (emphasis added).

[7] *See* 19 U.S.C. § 1677j.

It is a well-established rule of statutory construction that "where Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[8]  As a result, contrary to the Government's claim, limiting the analysis to the criteria enumerated in Section 1677j is not inherently sufficient to support the conclusion that Commerce properly initiated the circumvention inquiry.

It is clear that the factors identified in the circumvention provisions of the statute are not intended to provide an exhaustive list of items to be considered when determining whether to initiate a circumvention inquiry.  Indeed, this Court has specifically noted that Commerce should consider factors not listed in the statute before initiating a circumvention inquiry.[9]  Contrary to the Government's claim, then, Commerce's refusal to consider whether its previous negative investigation determinations precluded initiation of a circumvention inquiry cannot be justified by the language of the statute.

> 2.   *The Statute Does Not Support Including SSV's CWP*
>      *in an Affirmative Circumvention Determination*

The Government and Defendant-Intervenors also argue that Commerce's affirmative circumvention determination was consistent with the statute, because Commerce applied the statute "as written" and evaluated all criteria set forth in Section 1677j(b) to find circumvention by merchandise "complete or assembled" in a third country.[10]  As a result,

---

[8] *Russello v United States*, 464 US 16, 23, 78 L.Ed 2d 17, 104 S Ct 296 (1983).

[9] *See e.g.*, *Hylsa, S.A. de C.V. v. United States*, 960 F. Supp. 320, 322–23 and 36 (CIT 1997), aff'd sub nom. *Hylsa, S.A. v. Tuberia Nat., S.A.*, 135 F.3d 778 (Fed. Cir. 1998) (criticizing Commerce for "…not decid{ing} prior to initiating the inquiry whether it had the statutory authority to conduct the anticircumvention inquiry after the final scope determination had issued excluding the merchandise").

[10] *See* Government's Brief at 13 and Defendant-Intervenor's Brief at 17.

they claim that consideration of Commerce's previous negative investigation determinations goes beyond the plain meaning of the statute and would render the circumvention provisions superfluous.[11]  Defendant-Intervenors also claim that preventing Commerce from making a circumvention determination because of a previous negative investigation determination on the product would impermissibly create a *de facto* exception not identified in the statute.[12]  However, neither the Government nor Defendant-Intervenors engage in any critical analysis of the language of the statute under the relevant rules of construction.  Such an analysis, in fact, demonstrates that Commerce's application of the circumvention provision to SSV's CWP products was not consistent with the plain meaning of the statute.

<blockquote>a.  The Plain Meaning of the Circumvention Statute<br>Must be Derived from the Overall Statutory Scheme</blockquote>

A cardinal rule of statutory construction is that a statute is to be read as a whole, rather than isolating phrases from the purpose of the statutory scheme.[13]  As a result, "the meaning of statutory language, plain or not, depends on context."[14]

As explained in detail in SSV's initial brief, a reading of the statute as a whole and in consideration of the overall statutory scheme demonstrates that (1) when merchandise has been investigated and found to not cause injurious dumping or subsidies, the established statutory procedure is to conduct a new investigation before antidumping or countervailing

---

[11] *See id.*

[12] *See* Defendant-Intervenor's Brief at 18.

[13] *See e.g.*, *NTN Bearing Corp. of Am. v. United States*, 26 CIT 53, 102–03, 186 F.Supp.2d 1257, 1303 (2002) (internal citations omitted).

[14] *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S. Ct. 570, 574, 116 L. Ed. 2d 578 (1991).

duties may be imposed on those products; and (2) the enactment of the circumvention provision did not supplant that function of the statutory scheme but instead provided a new avenue to impose antidumping and countervailing duties on products that have not been investigated previously.[15]  As a result, when read in context, it is apparent that applying the circumvention provisions to SSV's CWP products that had been investigated and found to not cause injurious dumping or subsidies was contrary to the plain meaning of the statute.

The Government and Defendant-Intervenor, nevertheless, argue that because the circumvention provision allows Commerce to impose duties on products without conducting an investigation, the circumvention statute must be read to apply to previously investigated products that resulted in a negative determination.[16]  However, their argument depends on the false assumption that products that have never been investigated are legally the same as products that have been investigated and found not to be dumped or subsidized.  The distinction between the two types of products is clear:  For the first, there has been no finding whether or not the product was dumped or subsidized.  For the second, there has been a finding based on a factual record that there was not dumping or subsidies.

This Court has made clear that a negative final determination in an investigation "extend{s} *in futuro*" until it is otherwise overturned.[17]  In these circumstances, the fact that the circumvention statute permits Commerce to impose duties on uninvestigated products that meet the criteria set forth in Section 1677j, does not support the conclusion

---

[15] *See* SSV's Initial Brief at 15-20.

[16] *See* Government's Brief at 16 and Defendant-Intervenor's Brief at 17.

[17] *See Sandoz Chemicals Corp. v. United States*, 17 C.I.T. 1061, 1063 (1993) (explaining that a "negative injury determinations ... will, as a practical matter, extend *in futuro*, unless upset by an intervening judicial decision.") (citing *American Spring Wire Corp. v. United State*s, 7 CIT 2, 5, 578 F.Supp. 1405, 1407 (1984)).

that the circumvention statute may be extended to products that were investigated and found not to be dumped or subsidized.

Furthermore, contrary to the Government's and Defendant-Intervenors' claims, this contextual reading of the statute does not render the circumvention provisions superfluous. Indeed, to the best of our knowledge, every circumvention inquiry that resulted in an affirmative determination prior to this case involved products that had never been subject to an antidumping or countervailing duty investigation. As a result, limiting the circumvention procedure to uninvestigated products comports with Commerce's own past practice and gives meaning to each provision of the statute that provides different administrative procedures for imposing duties on previously investigated products versus uninvestigated products.[18]

> b. *Failure to Consider Negative Investigation Determination Inconsistent with Treatment of Affirmative Investigation Determination*

Commerce's determination took the position that it did not need to consider its previous negative investigation determinations because the circumvention statute does not explicitly require such consideration.[19] But that position has been contradicted by the Government in its brief. The Government concedes that, if merchandise was investigated and *affirmatively* found to be dumped and/or subsidized, the circumvention provision of

---

[18] *See e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant....").

[19] *See e.g.*, Issues and Decision Memorandum for the Final Affirmative Determination of Circumvention of the Antidumping Duty Order on Certain Circular Welded Non-Alloy Steel Pipe from Korea ("Korea I&D Memo"), Nov. 2, 2023, at 15-16 (256-APPX007539-007540).

the statute would *not* apply.[20]  But the circumvention provision of the statute does not

expressly state that a prior *affirmative* determination has such a preclusive effect.[21]  Thus,

the silence of the statute cannot, as Commerce would have it, be dispositive.  Instead, the

treatment of products subject to previous negative or affirmative determinations depends

on the logic of the statutory scheme.[22]  Therefore, Commerce must consider and explain

why it was permitted to make an affirmative circumvention determination on products

subject to previous negative determinations in view of the language and purpose of the

statute.  Commerce's broad assertion that it was not required to consider its previous final

determinations regarding SSV's CWP products cannot be sustained.

> c.  *Prohibition of Circumvention Inquiries on*
> *Products Subject to Previous Negative*
> *Determinations Does Not Create a De Facto*
> *Exception that Is Contrary to the Statute*

Defendant-Intervenors claim that prohibiting Commerce from conducting a

circumvention inquiry on products that were previously investigated and found to not

cause injurious dumping or subsidies would impermissibly create a *de facto* exception not

found in the statute.  In support of that claim, Defendant-Intervenors cite this Court's

decision in *Al Ghurair* which found that excluding "affirmative findings of circumvention

in any circumstance in which there was a pre-existing facility in a third country would

---

[20] *See* Government's Brief at 15.

[21] *See* 19 U.S.C. § 1677j.

[22] *See e.g.*, *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 789, 140 S. Ct. 1731, 1827, 207 L. Ed. 2d 218 (2020) ("Another longstanding canon of statutory interpretation… tells courts to avoid construing a statute in a way that would lead to absurd consequences. The absurdity canon, properly understood, is an implementation of… the ordinary meaning rule.") (internal quotations omitted).

create a *de facto* exception to the statute."[23]  However, the Court's conclusion was not based on a general objection to *de facto* exceptions or a finding that statutory silence precluded such exceptions.  Instead, the Court analyzed the language of the statute to determine whether the specific exception requested by the plaintiff in that case could reasonably be supported by the text.  The Court in *Al Ghurair* found that Congress had included temporal requirements for other factors but had explicitly limited the analysis of third-country production facilities to only the "extent" of those facilities.[24]  As a result, the Court concluded that the plain text of the statute did not support a requirement that circumvention action could be taken only when production facilities were established after the order.[25]

By contrast, there is no textual basis precluding an exception from circumvention action when a product has been the subject of a previous negative determination of dumping and/or subsidies.  And, there is a textual basis for finding such an exception.  The heading of the section indicates that the purpose of the provision is to "prevent circumvention."[26]  Furthermore, for merchandise completed or assembled in a foreign country, the statute specifically states that Commerce may make an affirmative

---

[23] *See* Defendant-Intervenors Brief at 18.

[24] *See Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1370 (CIT 2021), aff'd, 65 F.4th 1351 (Fed. Cir. 2023).

[25] *See id*.

[26] *See* 19 U.S.C. § 1677j.  *See also*, *Dubin v. United States*, 599 U.S. 110, 120–21, 143 S. Ct. 1557, 1567, 216 L. Ed. 2d 136 (2023) ("the heading of a section are tools available for the resolution of a doubt about the meaning of a statute…") (internal citations and quotations omitted).

circumvention determination only if "…*action is appropriate…to prevent evasion*..."[27] The fact that SSV's CWP produced in Vietnam with HRC from any country were previously investigated and found not to be dumped or subsidized negates any claim that inclusion of these products in other existing orders is necessary to "prevent circumvention" or is "appropriate to prevent evasion" of antidumping or countervailing duty orders. Accordingly, unlike the situation in *Al Ghurair*, the text of the statute supports a finding that the previous negative determination on SSV's CWP made with imported HRC should preclude anticircumvention action.

> d.    *The Differences in the Periods Examined Does Not Justify Allowing Anticircumvention Action against Products Previously Found Not to Be Dumped or Subsidized*

Finally, the Government and Defendant-Intervenors argue that Commerce's previous determinations cannot be used to preclude a future circumvention inquiry, because the investigations covered merchandise during a different period.[28] That argument is, however, contrary to the statutory scheme. Under the statute, investigated companies with *de minimis* dumping margins or subsidy rates are excluded from any antidumping or countervailing duty order resulting from the investigation for all time.[29] As a result, the *de minimis* rates from the original investigation continue to apply to such companies in all future periods, and cannot be changed by subsequent administrative reviews. The only administrative action that can change the enduring effect of a negative determination in an

---

[27] *See id*. 19 U.S.C. § 1677j(b)(1)(E).

[28] *See* Government's Brief at 22 and Defendant-Intervenor's Brief at 15-16.

[29] *See* SSV's Initial Brief at 14.

investigation is a new investigation.  As a result, the difference between the periods

examined in the original investigations and in the circumvention inquiry are irrelevant.

    C.   *Commerce Was Not Permitted to Apply the*
        *Dumping and Subsidy Rates from the China,*
        *Korea, and India Investigations to SSV's CWP Exports*

      Nevertheless, even if Commerce were permitted to conduct a circumvention inquiry

on SSV's CWP exports made with Chinese, Korean, or Indian HRC, and correctly

concluded that such exports were circumventing the antidumping and countervailing duty

orders from those countries, the dumping and subsidy rates applied to SSV's exports

cannot be sustained.

      As explained in SSV's initial brief, Commerce has applied the all-others dumping

rates and country-wide subsidy rates from the China, Korea, and India CWP investigations

to SSV's products that are purportedly circumventing those orders.[30]  Commerce did not

explain why those rates should be applied to SSV's exports in this case.  Commerce has,

however, explained in previous cases that it uses the all-others and country-wide rates from

the investigation of the allegedly circumvented orders, because Commerce does not have

company-specific final determinations of dumping or subsidies for the third-country

producers at the time of the circumvention determination.[31]  Furthermore, this Court held

in *Forest International* that, even if Commerce has not calculated company-specific

dumping or subsidy rates for the third-country companies subject to the circumvention

inquiry, Commerce's cannot use the all-others or country-wide rates from the investigation

of the allegedly circumvented orders without considering evidence whether those rates are

---

[30] *See id*. at 22.

[31] *See id*.

appropriate for the third-country companies.[32]  Without such consideration, automatic use of the country-wide or all-others rate from the investigation of the allegedly circumvented order could frustrate the remedial purpose of the statute.[33]

As explained above, Commerce has made final determinations of the dumping and subsidy rates for SSV's CWP made with imported HRC prior to the circumvention inquiries.  Furthermore, Commerce's previous investigation determinations of zero dumping and *de minimis* subsidies for SSV's CWP products made with imported HRC (including from China and Korea) are indisputably evidence of what the appropriate rate for SSV should be.  Commerce's failure to consider that evidence when selecting the applicable rates in the circumvention inquiries renders its decision arbitrary and unsupported by substantial evidence.

Neither the Government nor Defendant-Intervenors address this Court's previous determination in *Forest International*.  Instead, the Government simply relies on its arguments that Commerce correctly found circumvention in this case.[34]  Those arguments are plainly irrelevant and insufficient to overcome Commerce's responsibility to select a rate for each company subject to the inquiry that is appropriate and not punitive.

For their part, Defendant-Intervenors argue that Commerce was permitted to apply the dumping and countervailing duty rates from the China, Korea, and India CWP orders to SSV's products because Commerce was punishing a "separate category of malfeasance."[35]

---

[32] *See Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388, 1402–03 (Ct. Int'l Trade 2021).

[33] *Id*. at 1403.

[34] *See* Government's Brief at 21.

[35] *See* Defendant-Intervenor's Brief at 20.

But that is an improper *post hoc* rationalization.[36]  As mentioned, Commerce uses the antidumping and countervailing duty rates from the underlying order, because it usually does not have company-specific rates for the third-country companies subject to the circumvention inquiry.  Commerce did not rely on any purported difference in "malfeasance."  And such a claim has no basis in the statute, which requires that deposit rates be based on evidence of what dumping or subsidies would exist, and not on punitive intent.[37]  Defendant-Intervenor's argument cannot be sustained.  If Commerce is permitted to find circumvention despite its previous negative determinations of dumping and subsidies, the Court should remand this case to require Commerce to determine the appropriate deposit rates for SSV based on the evidence provided by those determinations.

D.    *Commerce's Determination Failed to Meet*
      *All Criteria Required by Section 1677j(b)*

Section 1677j(b)(1) requires Commerce find that five criteria are met before Commerce may include merchandise completed or assembled in a foreign country within the scope of an existing antidumping or countervailing duty order.  As explained in SSV's initial brief, the evidence on the record does not support Commerce's finding for three of those criteria.[38]  As a result, Commerce's decision to include CWP produced by SSV with HRC from China, Korea, and India under the antidumping and countervailing duty orders on CWP from those countries is inconsistent with the requirements of the statute.  Neither

---

[36] *See e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (explaining that the court may not accept "post hoc rationalizations for agency action" and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself").

[37] *See* 19 U.S.C. § 1677b(a).  *See also*, *NTN Bearing*, 186 F.Supp.2d at 1208 (stating the antidumping laws "are remedial not punitive").

[38] *See* SSV's Initial Brief at 24-41.

the Government nor Defendant-Intervenor have provided any reason to conclude otherwise.

### 1.  SSV's Production Process Is Not "Completion or Assembly"

Section 1677j(b)(1)(B) requires Commerce find that the merchandise is being "completed or assembled" in a foreign country prior to export to the United States to make an affirmative circumvention determination.  But the statute does not define either term.[39] As a result, under normal rules of statutory construction, one must look at the ordinary meaning of the word, as well as, whether the word is defined elsewhere in the statute to ascertain its meaning.[40]  SSV identified that the dictionary definition of "completion" refers only to the final step of transforming an "incomplete" item into a finished product.[41] And, the term "incomplete" was defined in another provision of the same statute to mean an item containing the "essential character" of the finished product.[42]  Consequently, in order to conclude that SSV's production of pipe from HRC constituted a process of "completion," Commerce had to find that the HRC imported by SSV from Korea, China, and India had the "essential character" of the finished CWP.  Commerce did not make such

---

[39] *See Garg Tube Exp. LLP v. United States*, No. 21-00169, 2024 WL 4799475, at *7–8 (CIT Nov. 7, 2024) (explaining that *Loper Bright* extends to meaning of undefined terms in a statute).

[40] *See e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) ("…we construe a statutory term in accordance with its ordinary or natural meaning."); and *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (""A term appearing in several places in a statutory text is generally read the same way each time it appears.")*.*

[41] There appears to be no dispute that SSV's production process of CWP is not assembly. Accordingly, SSV has not included further discussion on the meaning of "assembled" in this brief.

[42] *See* SSV's Initial Brief at 25-26.

a finding and failed to address SSV's argument concerning the statutory definition of "complete" and "incomplete" merchandise.  Therefore, Commerce's determination cannot be upheld.

### a. CAFC Decision in Bell Supply Does not Preclude Use of the Essential-Character Test

In response, both the Government and Defendant-Intervenors contend that the decision by the Court of Appeal for the Federal Circuit ("CAFC") in *Bell Supply* precludes use of the essential-character test to identify "incomplete" products "completed" in a foreign country for purposes of the circumvention statute.  But the decision in *Bell Supply* addressed a different issue — whether a product that takes on a "new identity" or undergoes a "substantial transformation" requires a negative determination of circumvention.[43]  Furthermore, an "incomplete" item may have the essential character of the finished product even if it takes on a "new identity" or is "substantially transformed" when completed into the finished product.  For example, this Court has found that the knob component provided the essential character of a keyed entry device and that the pump provided the essential character of a tabletop fountain.[44]  As a result, use of the essential-character test to identify whether "incomplete" products have been "completed" does not contradict the CAFC's decision in *Bell Supply*.

### b. Other Court Decisions Cited by Defendant-Intervenors Are Distinguishable and Inapplicable to the Facts of this Case

Defendant-Intervenors also argue that:  (1) Commerce's finding that the CWP produced by SSV with imported HRC is "completed" merchandise is consistent with its

---

[43] *See Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1230–31 (Fed. Cir. 2018).

[44] *See Home Depot U.S.A., Inc. v. United States*, 435 F. Supp. 3d 1311, 1340 (CIT 2020).

previous circumvention determination involving CORE products upheld by the CAFC in *Al Ghurair;* and (2) that this Court's decision in *Hlds (B) Steel* held that Commerce did not need to determine whether the production activities in Vietnam was limited to completion.[45]  This Court must reject both contentions.

The *Al Ghurair* case involved corrosion-resistant steel ("CORE") products made from imported steel coil.  This Court noted that "…the production process in the UAE, include{ed} trimming, pickling, cold rolling, hot-dip galvanizing, coating, slitting and cutting."[46]  As a result, the processing performed in the third country in the CORE case only involved surface treatments and resizing the imported coil.  It did not result in processing the imported coil into a new form before export, meaning that the input imported to the UAE was steel coil and the final product exported to the United States was still steel coil.  By contrast, in this case, SSV's production process consists of slitting HRC to a desired width, *forming and welding the edges of the strips together into pipe*, cutting the resulting pipe to the desired length, and then applying finishing the pipe with operations like threading.[47]  As a result, the input imported to Vietnam was coil but the final product exported to the United States was pipe.  In these circumstances, the CAFC's decision in *Al Ghurair* is inapplicable to the analysis of whether the processing performed by SSV in this case qualifies as "completion."[48]

---

[45] *See* Defendant-Intervenor's Brief at 21-24.

[46] *See Al Ghurair*, 536 F. Supp. 3d at 1366.

[47] *See* SSV's Initial Brief at 8.

[48] We recognize that Commerce has found that imported steel coil processed into oil country tubular goods ("OCTG") in a third country circumvent orders on OCTG.  That decision was appealed in *Hlds (B) Steel*.  As described below, the appeal did not address whether that process constituted "completion" under Section 1677j(b)(1)(B).

With respect to this Court's decision in *Hlds (B) Steel*, the Court's full explanation was as follows:

> Because the statute treats "completion or assembly" as synonymous with "production process," the Department was not required to first make a specific finding as to the former terms as HLD contends.
>
> Instead, Commerce's duty was to determine whether HLD's "completion or assembly" of oil piping in Brunei and the Philippines was "minor or insignificant" given the criteria outlined in § 1677j(b)(2).[49]

With this context, it is clear that the Court was interpreting the requirements under § 1677j(b)(1)(C). And, the Court took the position that for purposes of § 1677j(b)(1)(C), Commerce could simply evaluate whether the production process in the third country was "minor or significant" without evaluating whether the production process is "completion or assembly." While we do not necessarily agree with the Court's analysis in *HLDS (B) Steel*, it does not contradict SSV's argument in this case.

As mentioned, SSV has challenged Commerce's determination under Section 1677j(b)(1)(B), which requires, in relevant part, that "before importation into the United States, such imported merchandise is *completed or assembled* in another foreign country from merchandise…. produced in the foreign country with respect to which such order..."[50] Furthermore, Section 1677j(b)(1)(C), which requires Commerce to determine whether the process is "minor or insignificant," does not require a finding that "completion or assembly" has occurred. Instead, Section 1677j(b)(1)(C) refers back to Section 1677j(b)(1)(B) as the source for determining whether "completion or assembly"

---

[49] *Hlds (B) Steel Sdn Bhd v. United States*, No. 21-00638, 2024 WL 244937, at *4 (CIT Jan. 23, 2024).

[50] (Emphasis added)

has occurred.[51]  In these circumstances, this Court's analysis in *Hlds (B) Steel* regarding the requirements of Section 1677j(b)(1)(C) does not apply to the statutory issue in this case.

> c.  *The Essential-Character Test Does*
> *Not Create Surplusage in the Statute*

Defendant-Intervenors also argue that items that share the same essential character of the finished product would already be covered by the same antidumping or countervailing duty order.  As a result, they claim that using the essential-character test to identify "incomplete" products "completed" in a third country would render Section 1677j(b)(1)(B)(ii) of the circumvention provision surplusage.[52]  However, as noted above, "incomplete" items that take on a "new identity" or are "substantially transformed" when completed may have the essential character of the finished product.  As a result, Defendant-Intervenor's complaint is unwarranted and should be dismissed.

> d.  *Examples in Legislative History Support*
> *Use of Essential-Character Test*

Defendant-Intervenors further claim that the example of color televisions as a "completed or assembled" product in the legislative history contradict use of the essential-character test.  Defendant-Intervenors explain that Congress identified the processing of color-television components as an example of circumvention the statute intended to address, but the primary components of color televisions do not meet the essential-

---

[51] *See* 19 U.S.C. § 1677j(b)(1)(C) ("*the process of assembly or completion in the foreign country referred to in subparagraph (B)* is minor or insignificant").

[52] *See* Defendant Intervenor's Brief at 22-23.

character test.[53]  Contrary to Defendant-Intervenor's assertion, the example reinforces SSV's argument.

As explained in SSV's initial brief, prior to the enactment of the circumvention statute, Commerce had treated color-television components, such as color picture tubes and printed circuit boards, imported separately from Korea as "incomplete" color televisions.[54] When enacting the circumvention provision, Congress clarified that such imports should be treated as parts that, when "assembled," would be subject to the new circumvention provision.[55]  Because this is an example of "assembly" identified by Congress for purposes of the circumvention statute and not an "incomplete" product being "completed" in another country, the essential character test would not apply.

By contrast, the example of an "incomplete" product "completed" elsewhere identified by Congress was "*steel pipe… imported by a related party that threads it and sells it as threaded pipe.*"[56]  The imported steel pipe necessarily has the essential character of the final threaded pipe.  As a result, the legislative history supports use of the essential-character test to identify whether the processing of HRC into CWP qualifies as "completion" for purposes of the circumvention statute.

>  e.  *Limiting "Completed or Assembled" to*
>      *the Last Processing Step is Workable*

Finally, Defendant-Intervenor claims that limiting "completed or assembled" to the last processing step would be unworkable, because it is difficult to "draw the line" for

---

[53] *See* Defendant-Intervenor's Brief at 26-27.

[54] *See* SSV's Initial Brief at 26-27.

[55] H. Rept. No. 100-40, Part 1 at 134.

[56] *Id.*

complex production processes.[57]  While Defendant-Intervenor may find it difficult to

identify the last step in a production process, Commerce has not.  In fact, in the *Al Ghurair*

case oft-cited by Defendant-Intervenor, Commerce's analysis of whether the merchandise

"completed or assembled" in the foreign country was limited to what Commerce identified

as the "last step" of the production process.[58]  In light of the fact that Commerce has

already identified and used the "last step" of the production process in other circumvention

cases, Defendant-Intervenor's complaint of unworkability must be dismissed.

> 2.  *SSV's Production Process Is*
> *Not "Minor or Insignificant"*

Section 1677j(b)(1)(C) states that Commerce may take action against third-country

production only when it finds that the process of assembly or completion in the third

country is "minor" or "insignificant."[59]  Section 1677j(b)(2) of the statute identifies certain

factors that must be considered by Commerce when deciding whether the third-country

production process is "minor" or "insignificant," but does not indicate that Commerce is

limited to a consideration of those factors alone.[60]

As explained in SSV's initial brief, assessment of the production processes performed

by producers in countries subject to existing antidumping or countervailing duty orders and

---

[57] *See* Defendant-Intervenor's Brief 24-25.

[58] *Certain Corrosion-Resistant Steel Products from the People's Republic of China:*
*Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85
Fed. Reg. 41957 (July 13, 2020), and accompanying I&D Memorandum at cmt. 1 ("…the
evaluation of the assembly/completion stages… indicate what portion of the total value of
the merchandise subject to these inquiries is accounted for by the last step of
processing…").

[59] *See* 19 U.S.C. § 1677j(b)(1)(C).

[60] *See* 19 U.S.C. § 1677j(b)(2).

the processes performed by the U.S. producers that seek an anticircumvention action is highly relevant to any finding whether processing performed in an allegedly circumventing foreign country is "minor or insignificant."[61]  In this case, the evidence confirms that the production processes employed by Korean companies subject to the antidumping order on CWP from Korea and the U.S. producers of CWP employ the identical production process to SSV (*i.e.*, import HRC and process into CWP).[62]  However, Commerce ignored this information when it concluded that SSV's production process was "minor" or "insignificant."[63]  As a result, Commerce finding that SSV's production activities were "minor" or "insignificant" is unreasonable and unsupported by substantial evidence.[64]

In response, the Government and Defendant-Intervenor argue that the CAFC in *Al Ghurair* has confirmed that Commerce does not need to compare the activities performed in the third country to the production activities of producers located in the order countries or the United States.[65]  However, the CAFC holding in *Al Ghurair* addressed only whether a comparison of the *level of investment* made by the allegedly circumventing companies to the *level of investment* made by Chinese coil producers was reasonable based on the facts

---

[61] *See* SSV's Initial Brief at 33-34.

[62] *See id.*

[63] *See* Korea I&D Memo at 29 (Commerce asserted it rests on the "*premise*" that CWP production starts with production of HRC) (256-APPX007553).

[64] *See e.g.*, *Universal Camera Corp. v. N.L.R.B.*, 340 U.S 474, 488 (explaining that Commerce's determination is not supported by substantial evidence when it fails to consider the full record and "take into account whatever in the record fairly detracts from its weight").  *See also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (explaining that a determination cannot be considered reasonable if the agency has "entirely failed to consider an important aspect of the problem" before it).

[65] *See* Government's Brief at 27-28 and Defendant-Intervenor's Brief at 29-30.

of that case.[66]  *Al Ghurair* did not purport to address the assessment of the other factors (such as "nature of the production process") that are listed in Section 1677j(b)(2).  And the parties in that case did not argue that processing in an allegedly circumventing country cannot be considered "minor" or "insignificant" when that processing is identical to the production process of the producers in the countries under the existing orders or in the United States.[67]  Accordingly, the CAFC's decision in *Al Ghurair* does not allow Commerce to evade its obligation to explain why it is reasonable to find that the activities performed by SSV in Vietnam are "minor or insignificant" when the production process for CWP performed in Vietnam is identical to that performed by SSV's Korean parent and the complaining U.S. producers.

Defendant-Intervenors also object to the statement in SSV's initial brief that U.S. producers of CWP would have no standing to claim to be part of the U.S. industry producing CWP if their production process were merely completion or assembly. Defendant-Intervenors contend that the assertion is barred by administrative exhaustion because SSV did not argue that "Defendant-Intervenors lacked standing to bring their circumvention claim."[68]  But Defendant-Intervenors have misunderstood our position. SSV did not and is not arguing that Defendant-Intervenors lack standing to request the circumvention inquiry.  Instead, our position is simply that, if the process of turning imported HRC into CWP reflects only a "minor or insignificant" "completion or assembly" of CWP as Commerce has concluded in this inquiry, then companies employing

---

[66] *See Al Ghurair*, 65 F.4th at 1359-60.

[67] *See id*. at 1359-61.

[68] *See* Defendant-Intervenor's Brief at 29.

that process would not qualify as a producer of CWP.  However, Commerce has previously determined that companies such as Wheatland Tube Company and Atlas Tube, Inc., are U.S. *producers* of CWP that had standing to bring forth antidumping and countervailing duty petitions on CWP from China, Korea, and India even though their production process is identical to SSV's production process.[69]  Commerce's disparate treatment of the production activities performed by SSV compared to U.S. producers is, therefore, arbitrary and unreasonable.[70]

> 3.  *Additional Factors Set Forth in Subsection (b)(3) Do Not*
>     *Support Conclusion that "Appropriate" to "Prevent Evasion"*

Finally, Section 1677j(b)(1)(E) requires a finding that action is appropriate to prevent evasion before making an affirmative circumvention determination.  Furthermore, subsection (b)(3) of the statute provides an illustrative list of factors that Commerce "shall take into account," and which Commerce used to determine whether action is "appropriate to prevent evasion" as required by Section 1677j(b)(1)(E) requires a finding before making an affirmative circumvention determination.[71]  In this case, Commerce found that the three factors identified in subsection (b)(3) were "mixed and inconclusive" with respect to SSV

---

[69] *See e.g., SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{I}t is well-established that an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.") (internal quotation marks and citation omitted).

[70] *See e.g., Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 Fed. Reg. 2445, 2446 (Jan. 15, 2008).

[71] 19 U.S.C. § 1677j(b)(3).

but that "other factors" support an affirmative finding.[72]  As a result, Commerce concluded that "…upon taking into consideration section 781(b)(3) of the Act, we… determine that action is appropriate to prevent evasion of the *Order* pursuant to section 781(b)(1)(E) of the Act."[73]  As explained in our initial brief, the record confirms that all three factors identified in subsection (b)(3) are non-existent for SSV.[74]  As a result, Commerce finding that the record is "mixed" is unfounded.  In addition, Commerce never identified what "other factors" it considered under Section 781(b)(3) of the Act that supported its conclusion that "action is appropriate to prevent evasion."[75]  In these circumstances, Commerce's determination failed to support a required element under the circumvention statute with substantial evidence and cannot be sustained.

In response, the Government contends that the factors set forth in subsection (b)(3) are discretionary while the criteria set forth in subsections (b)(1) and (b)(2) of the circumvention statute are mandatory.[76]  As a result, the Government claims that "{i}f other statutory criteria and factors in (b)(1) and (b)(2) supportive of affirmative determinations outweigh the (b)(3) factors, then such determinations are both reasonable and lawful."[77]  For their part, Defendant-Intervenors argue that, since the (b)(3) factors are not controlling, Commerce does not need to find that all three factors are present and can place different

---

[72] *See e.g.*, Certain Circular Welded Non-Alloy Steel Pipe from Korea: Preliminary Decision Memorandum for the Circumvention Inquiry on the Antidumping Duty Order ("Korea Prelim"), April 6, 2023, at 23 (256-APPX007024).

[73] *See e.g.*, Korea I&D Memo at 35 (256-APPX007559).

[74] *See* SSV's Initial Brief at 37-40.

[75] *See id.* at 40.

[76] *See* Government's Brief at 29-30.

[77] *See id.* at 30.

weight on each factor to reach an affirmative circumvention determination.[78]  In addition, Defendant-Intervenors claim that the "other factors" Commerce relied on was "a reference to the rest of Commerce's IDM" which contained its analysis of Sections 1677j(b)(1)(A) through (D) or the circumvention statute.[79]

But the Government and Defendant-Intervenors are incorrect.

First, while the factors listed in subsection (b)(3) are illustrative, the statute explicitly states that those or similar factors "shall" be considered by Commerce in making an affirmative circumvention determination.[80]  The Government's suggestion that Commerce can simply disregard (b)(3) does not, therefore, comport with the clear language of the statute and would effectively render subsection (b)(3) superfluous.

Second, Defendant-Intervenor ignores the fact that Commerce did analyze the three factors identified in (b)(3) and did not find that *any* factor supported a finding of circumvention.  Accordingly, there is no "weight" that Commerce could have given to any of those three factors to reasonably support an affirmative conclusion.

Finally, it is clear from the structure of Commerce's determination, that the "other factors" referenced were other factors to be considered under subsection (b)(3) and not the previous parts of the statute, and Commerce did not identify (b)(3) factors other than the three enumerated in the statute.[81]  Furthermore, Commerce used the (b)(3) factors to support its finding that Section 1677j(b)(1)(E) ("action is appropriate to prevent evasion")

---

[78] *See* Defendant-Intervenor's Brief at 33.

[79] *See id.*

[80] *See* 19 U.S.C. § 1677j(b)(3).

[81] *See e.g.*, Korea Prelim at 18-22 (256-APPX007019-007023).

was satisfied.  In these circumstances, the "rest" of Commerce's analysis regarding Sections 1677j(b)(1)(A) through (D) is irrelevant.  Commerce's failure to make an affirmative finding for *any* of the three (b)(3) factors, means that it failed to support its conclusion that "action is appropriate to prevent evasion" reasonably and with substantial evidence.[82]

CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant SSV's motion for judgment on the agency record, and remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/ Jeffrey M. Winton
Jeffrey M. Winton
Amrietha Nellan
Vi N. Mai

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Attorneys for SeAH Steel VINA Corporation

January 13, 2025

---

[82] *See, e.g., NEXTEEL v. United States*, 355 F. Supp. 3d 1336, 1351 (CIT 2019) ("It does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion. The court concludes that Commerce's determination of the existence of one particular market situation in Korea is unsupported by substantial evidence.").

CERTIFICATE OF COMPLIANCE

Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 6,990 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

/s/   Jeffrey M. Winton

January 13, 2025